N. T. VEATCH, Respondent-Appellant, v. FAYE B. BLACK, Administratrix of the Estate of ERNEST BATEMAN BLACK, Deceased, Appellant-Respondent, No. 42766—250 S. W. (2d) 501.

Division Two, June 9, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, July 14, 1952.

*R. B. Caldwell, Robert S. Eastin, M. D. Blackwell* and *Caldwell, Downing, Noble & Garrity* for respondent-appellant N. T. Veatch.

*Albert Thomson, Harold T. Van Dyke* and *Johnson, Davis, Thomson, Van Dyke & Fairchild* for respondent-appellant Faye B. Black.

BOHLING, C.—These are cross appeals from a declaratory judgment construing certain provisions of the written agreement of partnership of Black and Veatch, Consulting Engineers, of Kansas City, Missouri, applicable upon the death of one of the partners. E. (Ernest) B. Black, a partner, died on July 4, 1949. N. T. Veatch, also known as N. T. Veatch, Jr., the other partner, instituted the action against Faye B. Black (the widow of E. B. Black), Administratrix of the Estate of Ernest B. Black, Deceased. A main controversy is occasioned by the income tax law. The declaratory judgment of the

trial court on the issues presented was, briefly stated, to the effect (1) that the agreement provided for a liquidation and not a sale of the retiring partner's interest and an accounting which divided the earnings received on partnership contracts completed after Mr. Black's death equally between Mr. Black's estate and Mr. Veatch as a distribution of income (after general taxes but before income taxes) conformed to the agreement; (2) that charging bonuses paid to certain partnership key employees for services in completing the partnership contracts as an overhead expense of the partnership was proper; and (3) that certain contracts treated as new business of the surviving partner were under the agreement the completion of partnership or old contracts and should be so treated. The amount involved vests jurisdiction here. On plaintiff's appeal the rulings with respect to "(3)," supra, are questioned; whereas, on defendant's appeal the rulings with respect to "(1)" and "(2)," supra, are questioned.

Plaintiff was first associated with Mr. Black as an employee in 1909. In 1915 they became partners under the name of Black and Veatch. In 1923 this partnership was dissolved, Mr. Black having encountered financial difficulties. Mr. Veatch continued [503] the business as "Black and Veatch" with Mr. Black as an employee. Under a written agreement, dated January 1, 1937, the partnership of Black and Veatch was re-established and continued until the death of Mr. Black. The partners were men of high reputation in their profession. Black and Veatch performed professional engineering services, designing and supervising the construction of water supply, power and sewage systems, roads and pavements, air fields, et cetera. At Mr. Black's death the partnership had uncompleted contracts involving exceptionally large sums with corresponding fees (stated to be nonrecurring) to the firm.

Said partnership agreement of January 1, 1937, first reviewed the history of the Black and Veatch firm and stated the parties desired to renew the partnership. Then followed the "Now, Therefore," clause, reciting that "for One ($1.00) Dollar and other valuable considerations * * * N. T. Veatch, Jr., hereby sells and conveys to E. B. Black an undivided half interest in and to said business and property," describing the same (office furniture, fixtures, office and engineering equipment, instruments and supplies, accounts and bills receivable, pending contracts, other assets and choses in action), and that E. B. Black assumed one-half of all liabilities and obligations of the firm. The agreement then set forth provisions for the conduct of the partnership and restrictions on the partners for the protection of the partnership, for an accounting on January 1 of each year, oftener if necessary, and, in the event of the withdrawal or demise of either partner, "a complete audit of the business" by certified public accountants (paragraph II). It provided that neither partner was to "draw more money" from the partnership in any month than

that "due him for salary," determined by mutual agreement, and expenses incurred on behalf of the partnership (paragraph III); that income from all professional services of the partners belong to the co-partnership (paragraph IV); and that life insurance be carried on the lives of the partners and be distributed in a stated manner upon the death of a partner (paragraph VI).

The paragraphs of the agreement important to the instant issues are VIII and IX, but other provisions bear thereon.

Paragraph VII of the agreement required a retiring partner to give the other an exclusive six months' option "to purchase the interest of the other partner on the basis and according to the terms hereinafter provided for in case of the death of one of the partners."

Other pertinent provisions of the agreement read:

"VIII. 1. If either party shall die or be adjudicated bankrupt, or insolvent, or take proceedings for liquidation by arrangement or composition with his creditors, the partnership shall thereupon determine as to him, and he or his executors, administrators or assigns, as the case may be, shall have no interest in common with the surviving or other partner or partners in the property of the partnership, but shall be considered in equity as a vendor to the surviving partner, of the share in the partnership of the deceased or bankrupt or liquidating or compounding partner as and from the date of his death, or bankruptcy, or insolvency, or of his having compounded as aforesaid, for the price and on the terms to be arrived at under the provisions hereinafter contained.

"2. The method to be used in arriving at the amount due the retiring partner, or his administrators, executors or assigns, shall be based upon the value of that partner's interest as shown by the books of the partnership as of the effective date of the dissolution, with the following exceptions:

"(a) In figuring the value of the interest of said partner so retiring, the uncompleted contracts shall be handled by the following method: By carrying the contracts then held by the partnership to completion so as to arrive at the exact amount of the total fees, and the total direct charges on said contracts, and the consequent loss or profit to be derived therefrom. In determining the amount of the total fees and total direct [504] charges on such contracts, there shall be charged to such contracts a fair proportion of the office overhead during the period of completion based upon the percentage of total office overhead incurred on both old and new contracts which the direct cost of old contracts bears to the direct cost of all contracts handled by the office subsequent to the effective date. There shall be included in the overhead the proportionate share of a monthly salary of

the surviving partner not to exceed the last agreed to between the parties as a monthly drawing account.

"(b)  Partnership insurance shall be taken into consideration as heretofore set forth.

"(c)  All moneys received from charged off accounts, plan deposits forfeited, and other undisclosed assets, shall, when received, be divided equally between the parties.

"(d)  Unsecured liabilities and losses on book accounts ascertained after the effective date to be deducted.

"IX.  1.  The amount so found to be due the partner retiring as set forth in this section, shall be payable to said partner, his executors, administrators or assigns, in the following manner, to-wit:

"(a)  At the effective date of the retirement of one of the partners, the books shall be closed in the manner previously employed at the end of the calendar year, taking into account all assets and all liabilities at that date.  Books of the partnership shall be continued intact until the assets have been realized, the liabilities paid, and the jobs in progress computed, as hereinbefore provided.  Any new business undertaken by the surviving partner shall be recorded in a separate set of books as his individual venture.

"(b)  Within three months after the effective date a statement of the accounts shall be rendered by the surviving partner, and there shall be paid by the surviving partner the amount shown on the books as of that date as due said partner, less the sum of $5,000.00.  Thereafter, every six months, a written accounting shall be had, and the surviving partner shall pay the amount shown by the books of the company as due the retiring partner, less the sum of $2,500.00.  A final accounting and final payment shall be made of the entire interest of the retiring partner within thirty days after the last contract uncompleted at the effective date shall be completed.

"(c)  If at any time the retiring partner shall, by the method above outlined, receive more than his interest as finally determined, his executors, administrators or assigns agree to repay such sum.

"(d)  The retiring partner, his administrators, executors or assigns, shall have a lien on all of the assets belonging to the partnership at the effective date of dissolution.  Such lien shall be in the nature of a chattel mortgage or pledge, and in case of default in the payments as in this contract provided, said lien may be foreclosed as a chattel mortgage.

"(e)  In case of the death of the surviving partner prior to the payment in full of the retiring partner's interest then the entire balance due the retiring partner, irrespective of the other pro-

visions of this contract shall sixty (60) days thereafter become due and payable. In that event, until the full purchase price is paid, the partnership business shall be operated under the joint control of the representatives of the two estates or their nominees. It is the wish of both parties hereto that the business which they have established be continued by their trusted employees, and that, if possible, some arrangement of that kind be worked out by their representatives.

"(f) The retiring partner, his administrators, executors, or their nominees, shall have the right to examine the books of the partnership and of the surviving partner at any time prior to the final payment for his interest.

"X. It is further understood that the surviving partner shall pay and discharge all the liabilities of the partnership, and shall hold the estate of the retired partner harmless from any liabilities thereon."

"XIII. In order to illustrate the application of the agreed method of determining the value of the retiring partner's interest herein provided for, there is appended hereto, made a part hereof, and marked 'Exhibit A,' a theoretical valuation based upon figures comparable to those contained in the firm statement as of December 31, 1936."

The "Exhibit A" attached to and a part of the agreement under paragraph XIII sets forth a balance sheet, showing assets and liabilities of the partnership as of December 31, 1936; and "Schedule 2" which reads:

## "Schedule 2.

"Liquidation of Black & Veatch.

| | E. B. Black | N. T. Veatch, Jr. |
|---|---|---|
| "Net Worth, December 31, 1936 | $ 8,000.00 | $10,100.00 |
| Subsequent Adjustments— | | |
| A. Adjust fixed assets | 2,500.00 | ———— |
| B. Charge fixed assets to survivor | ———— | 17,500.00 |
| Balance | $10,500.00 | $ 7,400.00 |
| D. Distribute $4,000.00 | 4,000.00 | ———— |
| Balance | 6,500.00 | 7,400.00 |
| F. Distribute $15,000.00—this is to be done so as to make partners' accounts equal | 14,450.00 | 550.00 |
| Balance | 7,950.00 | 7,950.00 |

| | | | |
|---|---|---|---|
| K. | Distribute operating profit (See below) | 10,950.00 | 10,950.00 |
| | Balance | 3,000.00 | 3,000.00 |
| L. | Final liquidation distribution | 3,000.00 | 3,000.00 |

After Mr. ·Black's death the interested parties agreed that an audit should be made by Francis R. Brodie of Hansen, Brodie & Company, Certified Public Accountants, as of June 30, 1949, instead of July 4, 1949, the day of Mr. Black's death. The testimony was that the audit conformed to the accounting practice of the firm, covered the period from January 1, 1949 (the last prior audit), to June 30, 1949, and, among other things, showed there was due Mr. Black $10,777.35 and due Mr. Veatch $6,378.88. Mrs. Black was paid the $10,777.35 by check dated September 30, 1949.

On February 15, 1950, an audit covering from July 1, 1949, to December 31, 1949, of Black and Veatch by Mr. Brodie's firm was delivered to Mrs. Black. This disclosed, under the completed contract accounting practice of the firm, profits after general taxes but before income taxes of $413,400.53, and a check for $206,700.27 was tendered Mrs. Black. (Mr. Veatch did not withhold the $2,500 authorized under paragraph IX, 1(b).) Mrs. Black refused the tender because "bonuses" to key employees had been charged as an overhead operating expense. Under Mr. Brodie's instructions Social Security taxes and expenses incurred in attempting to procure new business not obtained were continued as an operating expense on the theory new business permitted holding the organization together and absorbed some of the overhead expenses. Mrs. Black later interposed objections to the two last mentioned items and Veatch tendered to her a check, dated August 1, 1950, for $218,456.53, adjusting said items, [506] plus interest from April 1, 1950. This $218,456.53 payment was accepted without prejudice.

I. *The Sale or Liquidation Issue.* On this issue the trial court found that the true intent of the agreement was to provide for a liquidation of the partnership by completing the uncompleted partnership contracts and not to effect the sale of the deceased partner's interest; that the sums payable to defendant were distributions of income accruing from the performance of said contracts; and that plaintiff had conducted the affairs of the partnership after Mr. Black's death as the surviving and liquidating partner, and not as sole owner.

Plaintiff contends the trial court was correct, and that defendant receives one-half of the partnership earnings (after proper expenses, including general taxes but before income taxes) as if partner-

ship income, the same as Mr. Black would have received it had he lived and continued to be a partner.

Defendant refers to this as the "income tax issue"; stating the amount of money which plaintiff owes defendant is the same whether the partnership agreement be one of purchase and sale or "the sums paid and payable * * * are * * * distribution of income" as determined by the trial court, and contends the Federal cases hold sums paid to the estates of deceased partners are not distribution of income unless (1) the estate of the deceased partner shared in the profits and losses on new business or (2) the estate of the deceased partner received only what had been already fully earned on the date of death.

Taking the agreement as a whole it is ambiguous as to the instant issue. We have examined the cases stressed by plaintiff[1] and by defendant,[2] and think we need not develop them as the construction of the contract depends on the intent of the parties and its language, a question of mixed law and fact. The trial court did not undertake to determine any tax issue, and our review is restricted to the issues presented here involving the construction of the agreement by the trial court.

Many expressions in the agreement are indicative of a sale. Upon the death of a partner the partnership "shall thereupon determine as to him," and his administrator "shall have no interest in common" with the survivor "in the property of the partnership," but "shall be considered in equity as a vendor" of his share to the other from the date of death "for the price and on the terms" thereafter set forth in the agreement (VIII, 1). In conformity with "in equity as a vendor," a lien is provided in paragraph IX, 1(d). An adjudication of bankruptcy, insolvency, or proceedings for liquidation are placed on the same footing with the death of a partner (VIII, 1). The agreement next contemplates that the partnership books be closed, and the then "amount due" is based on the "value" of the deceased "partner's interest" as shown by the partnership books as of the date of death (VIII, 2; IX, 1(a)), with payment thereof to be made within

[1]Gudeon v. Commissioner of Internal Revenue (1935), 32 B. T. A. (U.S.) 100, 109, 110; McAfee v. Comm. of Int. Rev. (1947), 9 T. C. (U.S.) 720, 724, 726; Bull v. United States (1935), 295 U. S. 247, 256, 55 S. Ct. 695, 79 L. Ed. 1421; Helvering v. Smith (C.C.A. 2d, 1937), 90 F. 2d 590, 592[5]; Doyle v. Comm. of Int. Rev. (C.C.A. 4th, 1939), 102 F. 2d 86, 88[1]; Hallowell v. Comm. of Int. Rev. (1939), 39 B. T. A. (U.S.) 50, 55.

[2]Hill v. Comm. of Int. Rev. (C.C.A. 1st, 1930), 38 F. 2d 165, 168[2]; Pope v. Comm. of Int. Rev. (C.C.A. 1st, 1930), 39 F. 2d 420, 423[3]; Bull v. United States (1935), 295 U. S. 247, 254, 255, 55 S. Ct. 695, 79 L. Ed. 1421; Benedict v. Price (N.Y. D.C., 1929), 38 F. 2d 309, 312[3, 5]; Edwards v. Comm. of Int. Rev. (C.C.A. 10th, 1939), 102 F. 2d 757, 759[5]; Nutter v. Comm. of Int. Rev. (1942), 46 B T. A. (U.S.) 35, 39; Carter v. Comm. of Int. Rev. (1937), 36 B. T. A. (U.S.) 60; City Bank Farmers Trs. Co. v. Comm. of Int. Rev. (1933), 29 B. T. A. (U.S.) 190; Miller v. Comm. of Int. Rev. (1938), 38 B. T. A. (U.S.) 487.

three months (IX, 1(b)) but "with the following exceptions" (VIII, 2). The terms "value" (VIII, 2; VIII 2(a); XIII) and "valuation" (XIII) appear in connection with [507] the method outlined for determining the "amount due," and the terms "payment in full," "balance due," "purchase price" (IX, 1(e)), and "purchase" (VII) appear.

A contract of doubtful meaning will be given a construction which will make it fair and reasonable between the parties and will not give one party an unfair advantage of another. Mecartney v. Guardian Trust Co., 274 Mo. 224, 202 S. W. 1131, 1134[2]. "Common sense and good faith are leading characteristics of all interpretations." Paisley v. Lucas, 346 Mo. 827, 143 S. W. 2d 262, 268[5-7]. Consideration is given to the contract as a whole and the fundamental rule for construing its language is to ascertain and give effect to the intention of the parties. Paisley v. Lucas, supra; Larson v. Crescent Planing Mill Co., Mo. App., 218 S. W. 2d 814, 819[2]. Greater regard is given the clear intention of the parties than the particular words used in attempting to express it. Larson v. Crescent P. M. Co., supra; Rickey v. New York Life Ins. Co., 229 Mo. App. 1226, 71 S. W. 2d 88, 93. The court considers the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances leading up to and attending its execution, and the apparent purpose which the parties were undertaking to accomplish. Paisley v. Lucas, supra; Larson v. Crescent P. M. Co., supra, and cases cited. The interpretation of the contract by the parties, especially at the time of its execution, is an aid. Paisley v. Lucas, supra; Smith v. Crane, 169 Mo. App. 695, 154 S. W. 857, 859[1].

As provided in paragraph VIII, 1, death causes a dissolution, a "determination," of a partnership, but the partnership has a kind of continued existence until its assets are collected and distributed to creditors or in accord with the partnership agreement. Wilson v. Hoover, 342 Mo. 1182, 119 S. W. 2d 768, 771[1]; Schneider v. Newmark, 359 Mo. 955, 224 S. W. 2d 968, 971[3-6]; § 358.300, RSMo 1949. A surviving partner succeeds to the rights of a deceased partner in the partnership assets for the purpose of winding up the partnership business. Groves v. Aegerter, 226 Mo. App. 128, 42 S. W. 2d 974, 978[2, 4]; Brinkop v. Brinkop, Mo. App., 215 S. W. 2d 70, 77; § 358.250(4), RSMo 1949; 40 Am. Jur. 335, §§ 296, 299. This is consistent with the provision that the administrator "have no interest in common" with the survivor "in the property of the partnership." Mr. Black and Mr. Veatch had been closely associated for over a quarter of a century in a highly technical engineering business and it was reasonable that each desired the other to wind up the partnership business and to be free from interference by the representatives of the other. The agreement does not state the deceased partner's

estate is a vendor, but that it "shall be considered in equity as a vendor," giving rights in equity, but not at law, to receive money while withholding control; and then follows "for the price and on the terms to be arrived at under the provisions hereinafter contained" (VIII, 1), and the provision for a lien (IX, 1(d)). The agreement does not characterize the survivor as a purchaser or vendee. The "Now, Therefore," clause of the agreement recited that "N. T. Veatch, Jr., hereby sells and conveys to E. B. Black an undivided half interest in and to" the business and property. This provided for a sale, purchase and conveyance; but the language in paragraph VIII, 1, differs, and evidences some difference in intent on the part of the partners.

The "amount due" as of the date of death is to be "based upon the value of that partner's interest as shown by the books," which "shall be closed" the same as at the end of a year (VIII, 2; IX, 1(a)), "taking into account all assets and all liabilities at that date (IX, 1(a)), which amount due is to be paid within three months (IX, 1(b)); but there are exceptions thereto (VIII, 2). The partnership books are to be continued and separate books set up for the survivor's new business (IX, 1(a)). This accounting of June 30, 1949, under which plaintiff paid the defendant $10,777.35, is not here questioned. The instant issue involves the earnings on partnership contracts completed after Mr. Black's death up to the accounting of December 31, 1949.

The exceptions within the phrase "with the following exceptions" (VIII, 2) referred to several items, principally the uncompleted contracts. The completion of said contracts would extend over several years. The partnership books were kept on the "completed contract" basis—gains or losses on a particular contract were not determined, transferred or distributed until that contract was completed. "In figuring the value of the interest" of the retiring partner, the survivor was to carry the contracts to completion (VIII, 2(a)). Surviving partners usually have an obligation to complete the executory contracts of a partnership. Whitesell v. Pioneer Constr. Co., Mo. App., 2 S. W. 2d 147, 149[4, 5]; Feucht v. Corbett, 214 Ind. 103, 12 N. E. 2d 957, 959[2, 4]; 40 Am. Jur. 339, § 301. The total fees and total direct charges were to be allocated to the particular contract, and overhead expenses were to be apportioned between the old and new, or Veatch, contracts. The provision for charging a proper share "of a monthly salary" (VIII, 2(a)) (drawing allowance) to the surviving partner is not common to a contract of sale and purchase, but is proper to a liquidating partner. § 358.180(6), RSMo 1949; 40 Am. Jur. 348, § 314. These provisions (VIII, 2(a)) are for the stated purpose of arriving at the "consequent loss or profit" on the uncompleted contracts, and paragraph IX, 1(c) provided that if the "retiring partner," by the method outlined, "receive

more than his interest as finally determined" it was to be repaid. The deceased partner's estate shared in the losses and the profits on the uncompleted contracts.

The provisions for the equal division of moneys received from charged off accounts, plan deposits forfeited, and other undisclosed assets (VIII, 2(c)), and the deduction of unsecured liabilities and losses on book accounts (VIII, 2(d)) indicate a winding up of affairs and not a sale.

The provision in paragraph X that the survivor discharge all liabilities and hold the deceased partner's estate harmless would be usual where the survivor takes over all assets and assumes all liabilities. This paragraph is separate from the paragraphs covering the uncompleted contracts (VIII and IX), which contemplate the determination of losses and profits on the uncompleted contracts (VIII, 2(a)), and the retiring partner also agrees that any overpayment be repaid (IX, 1(c)).

Paragraph IX, 1(e) provides that "in case of" the survivor's death "prior to the payment in full of the retiring partner's interest, then the entire balance due" becomes payable in sixty days. The agreement, if a sale, contains no provision in any contingency for putting a price on the uncompleted contracts and its payment. Payment of the balance to eventually become due, involving losses and profits, is impossible of determination until all partnership contracts are completed, which might take several years. The surviving partner was authorized to withhold $2,500 under paragraph IX, 1(b). An accounting upon the survivor's death could only determine the balance then due. Paragraph IX, 1(e) also provides for the return of the control of the partnership business after the death of the survivor to the estates of the two partners "until the full purchase price is paid." The words used indicate a sale; but, as stated, payment cannot be made until all contracts are completed, and the operation of the partnership business under joint control until the performance of the partnership contracts has characteristics of a partnership relation.

The partners, however, put a construction on the contract when they illustrated its application to the agreed method of determining the value of the retiring partner's interest in Exhibit A, made a part of the agreement in paragraph XIII. That exhibit first sets forth the "Assets and Liabilities"; and "Schedule 2" thereof, which is concerned with the uncompleted contract feature of the agreement, is headed "Liquidation of Black and Veatch." It refers to "Distributions"; "Distribute Operating Profit," and "Final Liquidation Distribution." It does not mention sale or price. The parties treated the earnings on uncompleted contracts as though they were distributing partnership income as in liquidation of the partnership.

Mrs. Reeve, an employee since 1916 and in charge of the general office and financial records, was present when the agreement was entered into and evidently typed its draft. She testified Mr. Black stated he wanted an agreement to continue the partnership until the uncompleted contracts, in the event of Mr. Veatch's death, would be completed and the profits distributed as in the past, and in such a manner as not to have to go through the Probate Court; that the surviving partner was to liquidate all contracts that were in progress; that, when Mr. Veatch had been injured in an automobile accident, Mr. Black instructed her, should Mr. Veatch pass on, to continue the firm books and set up separate books for his work and he would continue until all firm contracts were completed, and that in his conversations at different times he made statements to like effect, and never used the words "buy" or "sell". Ray E. Lawrence, one of the key employees and a friend of Mr. Black, testified that Mr. Black told him that in the event of the death of either partner the surviving partner would liquidate all uncompleted contracts.

Paragraph VIII, 2(a) of the agreement speaks of loss or profit on the uncompleted contracts. Mr. Black and Mr. Veatch knew that partners were liable for Federal income taxes only in their individual capacities. 26 U. S. C. A. 181; 53 Stat. 69. A letter addressed to Mr. Veatch from Mr. Black on December 12, 1941, regarding the bonus payments for that year, recognizes that each would have to pay Federal taxes on his distributive share. Mr. Black knew, if the agreement were one under which the Federal income taxes had to be paid by the surviving partner, that the earnings would have to pay said taxes before there was a profit, the same as he had to pay Federal taxes on his distributive share before he had a profit. There are no real profits before the payment of taxes and other expenses of a business.

An exhibit based on the estimated earnings of Veatch continuing the partnership business and his new business for the years 1949, 1950, and 1951 shows assumed total earnings of $1,440,290.72, of which $1,313,400.53 is allocated to partnership business, one-half being $656,700.27, and $126,890.19 to Veatch business. Under plaintiff's theory of a distribution of earnings to the Black estate (as if Black had lived and continued a partner), Mr. and Mrs. Veatch, after payment of Federal income taxes, would have an estimated $257,-324.43; and the Black estate, after Federal income taxes on the distributees' shares, would have an estimated $358,397.77. Under defendant's theory of a sale and purchase the Federal income taxes of Mr. and Mrs. Veatch on the $1,440,290.72 are estimated at $1,076,190.52 and with the payment of $656,700.27 to defendant would result in Veatch sustaining a net loss of $292,600.07; and with the payment of Federal estate and State inheritance taxes chargeable to

the beneficiaries of the Black estate, the beneficiaries would receive an estimated net of $538,054.27.

It taxes the credulity to believe that the partners, by use of words tending to indicate a sale in paragraphs VIII and IX and the provision of paragraph VII, giving an option to a non-retiring partner "to purchase the interest" of a partner withdrawing from the partnership on the basis provided for in case of death, intended results similar to those reached under defendant's construction of the agreement as applied to the uncompleted contracts. What could the purchasing partner gain, if anything, under the uncompleted contracts provisions over a liquidation upon in good faith completing the uncompleted contracts and paying the retiring partner one-half of the earnings as if he continued a partner? We conclude, as did the trial court, the partners intended a distribution to the deceased partner's estate of earnings on partnership contracts completed after death the same as prior to dissolution and not a sale of earnings for a distributive share; but in either event the surviving partner under the agreement was to have an interest as owner only to his distributive share of the earnings on the uncompleted partnership contracts. This is in harmony with "Schedule 2," set forth herein, giving the partners' construction of the agreement, with Mr. Black's stated construction of the [510] agreement, with the dealings between the partners, and with certain provisions of the agreement. The agreement separated the accountings for the uncompleted contracts and the accounting as of the date of dissolution. One may share in partnership income without being a partner. London Assurance Corp. v. Drennen, 116 U. S. 461, 471, 472, 6 S. Ct. 442, 29 L. Ed. 688; Brown v. Commissioner of Internal Revenue, 10 B. T. A. (U.S.) 1036, 1049.

Plaintiff may not have followed the letter of the agreement in every particular, but the records were kept in such manner that defendant's interests were ascertainable. We agree with the trial court that plaintiff's operation of the partnership business was a substantial compliance with and a recognition of defendant's interests under the agreement.

II. *The Bonus Issue.* Black and Veatch had established the practice of paying key personnel what was designated "bonuses," the amount paid to any given employee being agreed upon by the partners and paid in December after the result of the year's business could be forecast. In December, 1949, Veatch paid total bonuses of $223,510 to key employees. They were charged to overhead expenses and 88.9795% or $198,878.08 was allocated to the partners' account as cost of completing partnership contracts, and the balance, 11.0205%, was allocated to Veatch's business. Veatch in the accounting was charged with, paid, his half of the $198,878.08. This accounting was approved by the trial court. Mrs. Black protested the payment of bonuses and attacks the charge against her husband's estate. The

amount paid was comparatively lower than in 1948, when Mr. Black was living, and its reasonableness is not challenged.

When Mr. Black died the partnership had 112 uncompleted contracts, involving millions of dollars of work and hundreds of thousands of dollars in fees. There were 450 employees at the time of trial. Many key employees, "sponsors," performed the same type of duties as the partners; procured contracts for the firm and carried them through to completion, conferring at times with the partners. They were competent engineers, capable of earning a high rate of compensation from employers or in the private practice of their profession. The salaries paid the younger employees were reasonable, but salaries paid the key employees, without the bonuses, were inadequate. No employee, outside of those on Government work, received over $6,000 a year. Out of the sixty-odd receiving a bonus in 1949, only five received a salary in excess of $6,000 and the salary of the greater number was less than $6,000. Bonuses were paid to keep the organization intact, and were necessary to the operation of the business as a going concern. In arriving at the bonus for a given employee the partners would discuss and consider the result of the year's business, the contribution made thereto by the employee, his business dealings, his length of service, the salary paid him, and a fair compensation for his work for the year. The salary was then deducted from what was arrived at as a fair compensation and the difference constituted the bonus payment.

The organization had paid bonuses, with the exception of the depression years of the 1930s, since 1919. Mr. Black was instrumental in inaugurating the system and active in its administration. He had informed top engineers when employed that they would receive a salary and a bonus when earnings justified it. He made application, under oath, during World War II to the Salary Stabilization Unit of the United States Treasury Department for and secured approval to pay bonuses, stating this had been the practice of the organization for twenty-five years.

The partnership agreement provided for the control and operation of the business in the surviving partner (VIII, 1) and the charging of the overhead costs against the partnership after its allocation between old and new business (VIII, 2(a)). It is not fairly conceivable that either partner intended the completion of the partnership business without continuing the settled policy of paying bonuses that reasonable compensation be paid the employees. The survivor might have established reasonable salaries. The reasonableness of the amount [511] paid is not in issue. Defendant's cases of Crowell v. Houde Eng. Corp., Mo. App., 19 S. W. 2d 516, 518[2, 3], and Hubbard v. Turner Department Store Co., 220 Mo. App. 95, 278 S. W. 1060, 1061[3], where employees sued to compel the payment of bonuses, do not control the instant issue involving a good faith compliance with sound

business principles and a settled understanding between the partners. Wm. S. Gray & Co. v. United States, 35 F. 2d 968, 974. The decree of the trial court on the issue is sustained.

III. *The Controversies Involving Four Contracts.* In May, 1949, Black and Veatch started assigning a number to a project when a file was opened. The project numbers had reached 1766 at the time of Mr. Black's death, and projects numbered 1767 and above were supposed to be new or Veatch business. The trial court found that No. 1783, Blair, Nebraska; No. 1808, Chanute, Kansas; No. 1810, Ottawa, Kansas; and No. 1867, Memphis, Tennessee, should be classified as old business or as parts of old contracts. Veatch appeals from the decree on "these four small contracts." None was completed in 1949 and, consequently, the accounting hereinabove discussed does not reflect the loss or profit on them.

From the record and the exhibits the court could find that Black and Veatch's offer to perform certain services for Blair, Nebraska, for $1,000 "top fee" was accepted by the City in a letter dated June 9, 1949, which letter was given project No. 1763. Thereafter, a formal contract was executed, bearing date of August 12, 1949, and provided for a fee not to exceed $1,000. This contract was given a new number—No. 1783—as new business. Mr. Veatch identified an exhibit as a list of contracts on hand at Mr. Black's death which he proposed to pursue to completion, and among the number is Blair, Nebraska, contract dated "8-12-49."

On December 18, 1945, the City of Chanute, Kansas, entered into a contract with Black and Veatch for certain engineering services described in Sec. I, paragraphs A to H, inclusive, agreeing to pay therefor as provided in Sec. II, paragraphs A to C, inclusive, of the contract. This contract was project No. 1647, and appears as an uncompleted contract on the exhibit listing the contracts uncompleted at Mr. Black's death and also in the accounting as of June 30, 1949, as an uncompleted "power plant improvements" contract. A letter of October 20, 1949, refers to project No. 1647, stating Black and Veatch was willing to extend the contract of December 18, 1945, to include the proposed boiler installations, but would be forced to revise the wage scale for the resident engineer outlined in Sec. II, C, of the contract, raising it to $600 from the $450 a month provided for in the contract, and that the contract need not be further changed as the boiler was definitely a unit recommended in the report covered by this contract. The proposed modification of the contract was accepted by the city in a letter dated October 25, 1949, stating also "otherwise the contract is to be in full force and effect." Although this letter was given project No. 1808, as though new business, it appears to be a part of project No. 1647 and old, or partnership, business.

The Memphis, Tennessee, contract is dated September 23, 1948, and carried project No. 1713. It is lengthy, and the parties evidently contemplated the work would take some time to complete, perhaps several years. Its subject matter is an adequate water supply and distribution to meet the water requirements, including fire protection, of the City in ten year periods from 1950 through 1980. Black and Veatch, among other things, were to prepare detailed construction plans, specifications, et cetera, for all construction work and equipment necessary for the constructing and equipping of a complete "water treatment plant, storage reservoirs and pumping station of proper and adequate size * * *," and, among other things, were also to supervise all construction and do all necessary tasks to obtain strict compliance with the construction contracts, plans, specifications, et cetera. The contract set out the schedule of fees to be paid Black and Veatch. After Mr. Black's death project No. 1867 was opened as Veatch business. As we read the exhibits and record, project No. 1867 relates to a new pumping station, stated, in [512] what we understand is a resolution adopted by the City officials, to be "in accordance with the terms and conditions of the contract for engineering services executed September 23, 1948." While Sec. G of the contract of September 23, 1948, excludes three or four specified items which the City officials contemplated designing and constructing, with the privilege to extend the contract to embrace such items, if desired, at a fee for such services as shall be mutually agreed upon, the record does not establish that project No. 1867 is within the items excepted from said original contract of September 23, 1948. · Mrs. Reeve, in charge of the records and files of Black and Veatch and of Mr. Veatch, testified she knew of no contract with the City of Memphis other than the contract of September 23, 1948, and in the accounting for the period ended December 31, 1949, total direct charges of $23,066.03 are made against project No. 1713, said Memphis contract, as an uncompleted partnership contract. There are no billings credited in the accounting. The trial court's holding is not established to be erroneous.

On April 10, 1946, the City of Ottawa, Kansas, and Black and Veatch entered into a contract for the partnership to furnish engineering services for the "proposed installation of an additional sludge digestion tank at the City Sewage Disposal Plant," including the plans, specifications, supervision of construction, et cetera, thereof, for the consideration stated in the contract. The contract was designated "Ottawa, Kans., Sewage Disposal." On September 15, 1948, a contract reciting it supplemented the contract of April 10, 1946, was executed, Black and Veatch agreeing to furnish such additional engineering services as requested by the City in connection with the "City sewer system or Sewage Disposal Plant or such other works as mutually agreed upon." Some testimony indicates the 1948 con-

tract was designated "Project 1723, sewer and sewage disposal, 1948." The record does not establish the occasion for the 1948 contract but Veatch states the sludge digester was never constructed. Negotiations between the City and Veatch, doing business as "Black and Veatch," were renewed in October, 1949, a letter from Black and Veatch stating the writer was informed the City was ready to proceed with the work covered in the contract dated April 10, 1946, and suggesting improvements other than that mentioned in the 1946 contract should probably be made. The City, on October 27, 1949, authorized Black and Veatch to proceed with a study of the entire plant that proper improvement be made; and, under date of April 12, 1950, referring to Black and Veatch's recommended improvements to the "Sewage Disposal Works of the City," authorized Black and Veatch "to proceed with the preparation of Plans and Specifications and Contract Documents providing for improvement of the Sewage Disposal Works in line with the recommendations set forth in your report" filed February 20, 1950. On April 14, 1950, Black and Veatch acknowledged receipt of this letter, stating: "We are proceeding with this work in accordance with your authorization under the terms of our contract dated April 10, 1946, as amended September 15, 1948." Letters in the file carry Nos. 1810 and 1869. The parties considered the "supplemental" contract of September 15, 1948, to contemplate work in the future on a "sewer system or sewage disposal plant" for the City although the purported contract at the time of its execution imposed no obligation with respect thereto. Mr. Black was living when the contracts of April 10, 1946, and September 15, 1948, were executed. When the City and Veatch agreed upon the improvements to be made for the sewage disposal of the City, Veatch treated and recognized the agreed upon improvements as implementing and being under the contract of April 10, 1946, as supplemented by that of September 15, 1948. It appears that this was Black and Veatch's method of conducting business. It is the interpretation Veatch placed upon it, and, in the circumstances, we think error is not established in the trial court's ruling to like effect as to the understanding between the partners.

We conclude the trial court reached the correct result on the controverted issues [513] presented for review and the decree and judgment should be affirmed. It is so ordered. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.