**CITY OF NORTH KANSAS CITY, MISSOURI, Appellant,**

v.

**P. Clifford SHARP, Appellee.**

No. 19206.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1969.

Rehearing Denied Sept. 10, 1969.

Wm. Harrison Norton, of Williams, Norton & Pollard, North Kansas City, Mo., for appellant, David L. Wells, North Kansas City, Mo., with him on the brief and reply brief.

John A. Ross, Kansas City, Mo., for appellee, Popham, Thompson, Popham, Trusty & Conway, Kansas City, Mo., with him on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

BLACKMUN, Circuit Judge.

P. Clifford Sharp instituted this diversity action against the City of North Kansas City, Missouri, to recover damages for himself and as trustee for Haskins, Sharp and Ordelheide, a partnership, for breach of an engineering contract. The case was tried to Judge Collinson without a jury. He approached it, first, on the issue of liability and then, having resolved that question in the plaintiff's favor, on the issue of damages. His separate opinions on those respective issues are not reported. The ultimate result was the entry of a judgment for the plaintiff and against the City for $131,262 plus interest.

The City appeals and asserts (1) nonliability because of the lack of authorization to enter into the contract; (2) nonassignability of the contract

without the City's consent, ratification, or waiver; (3) termination of the contract; and (4) errors in the computation of damages.

*The basic facts.* There is no real controversy about most of the facts. Prior to November 1957 the City had employed Haskins, Riddle and Sharp, a partnership of consulting engineers, on various projects. Mr. Haskins died in 1956 but William G. Riddle and the plaintiff Sharp continued in business under the old name. On November 12, 1957, when these two were the only partners, a "Memorandum of Agreement for Professional Engineering Services" was entered into with the City. This was executed on behalf of the partnership by Riddle and on behalf of the City by R. D. Scharz, Mayor, with Blanche E. Ford, City Clerk, attesting, and with the City Attorney approving in writing "as to form and legality". The agreement called for the performance by the partnership of specified engineering services in connection with proposed sanitary sewage projects.

The contract dealt initially with "Preliminary Phase Services" to be performed by the engineers. These included surveys and studies as to existing sanitary sewage works, growth trends, the adequacy of the existing works, recommendations for improvement, cost estimates, presentation of a report to the Division of Health of Missouri and to the City, assistance in pre-bond election activities, and assistance in obtaining a federal grant.

The agreement then referred to "Design and Supervision Services." The first paragraph under this heading read:

"6. When so instructed by the City, prepare complete contract and bid documents including detailed plans and specifications approved by the Di-

vision of Health of Missouri for the construction of recommended improvements."

Then followed provisions for assistance in obtaining bids, general supervision during the construction period and assistance to the City in overseeing and general administration of the construction, a final inspection and report, and, at the City's option, the furnishing of a competent resident engineer during construction.

The remainder of the agreement concerned the compensation to be paid the engineers.

Lorenz E. Ordelheide was admitted to the partnership in 1958.[1]

The City admits that the partnership properly performed all the work required of it under the heading "Preliminary Phase Services." The partnership was paid for those services. A bond issue election was held in 1960 and was favorable, and a federal grant was obtained.

Then:

1. On January 24, 1961, Riddle, as first party, and Sharp and Ordelheide, as second parties, executed an agreement effective as of December 31, 1960. This described them as "co-partners doing business as Haskins, Riddle and Sharp, Consulting Engineers" and provided for "the voluntary withdrawal" of Riddle; for nonauthorization of the use of the Riddle name by Sharp and Ordelheide; for Riddle's freedom "to use his own name in any new business venture which he may hereafter undertake"; for Riddle's assignment to Sharp and Ordelheide of his interest in the partnership assets; for the assumption by Sharp and Ordelheide of the firm's liabilities; for the payment to Riddle, on or before April 1, 1961, of a stated percentage of the partnership's net profits for calen-

---

1. The printed record states that Sharp so testified. We note, however, that it is alleged in the complaint that Ordelheide was a partner at the date of the 1957 agreement. That agreement makes no reference to him and we therefore assume

Sharp's testimony on this detail, in contrast to the complaint, is correct. In any event, the date of Ordelheide's entry into the partnership does not appear to be of significance so far as the posture of the City is concerned.

dar 1960; and for the payment to him, as received, of amounts specified as Riddle's share of accounts receivable and work in progress. It also recited,

"It is contemplated that each of the parties hereto will continue in the consulting engineering profession and will or may become competitors. As such, in the future each of the parties shall be free to serve any person, corporation, municipality or governmental agency without restriction, and regardless of whether or not such person, corporation, municipality or governmental agency may have heretofore employed the partnership of Haskins, Riddle and Sharp."

This agreement made no mention of the partnership's contract with the City. There is evidence in the record that Riddle promised Sharp and Ordelheide to hold himself available to complete the firm's outstanding contracts, that he did so work collectively with them, that he would have worked with them on the contract with the City if so requested, and that his willingness as to this was not communicated to the City.

2. On January 27, 1961, Sharp and Ordelheide sent to the City (and to other clients) a formal announcement that they "have acquired the interest of W. G. Riddle in the former firm." On the same day they also wrote a letter to Mayor Scharz, with a copy to City Clerk Ford, to the same effect and also stating:

"* * * We further wish to advise that there has been no dissolution of the partnership and that Mr. Riddle sold his interest in the formerly existing partnership to us including any interest which he may have had in any contracts existing as of December 31st, 1960.

"We further wish to advise that this office will continue to perform under our presently existing agreement with you, and that the work as required under the contract is going ahead without interruption."

3. On February 1 the City Attorney wrote the plaintiff stating that he had the letter of January 27 "relating to the dissolution of your partnership with Mr. Riddle." He went on to say:

"* * * It is my understanding that all preliminary phase services provided for in the memorandum have been completed by the partnership, Haskins, Riddle & Sharp, but that matters relating to design and supervision of services were to be begun only upon further instruction by the City. Thus, there remains nothing left to be done under preliminary phase services and nothing further to be done without further instruction by the City.

\* \* \* \* \* \*

"The City has been advised by their legal counselors that the dissolution of the partnership works a termination of any previous agreement or understanding.

"As you are aware, there are future plans relating to sewage problems in the City and it is felt that the City should be free to renegotiate any contracts or agreements involving such matters."

4. The plaintiff's attorney replied by a letter dated February 6, 1961. In it he stated (a) that the partnership of Haskins, Riddle and Sharp had not been dissolved; (b) that he did not agree that the agreement with the City had been terminated; (c) that the "present principals of the firm of Haskins, Sharp and Ordelheide stand prepared to continue their services under" the 1957 agreement; (d) that when plans and specifications and supervision under that contract were required, his clients would perform for the agreed fees; (e) that they could not comply with the suggestion that a release be executed to the City; and (f) that they did not agree that the City was free to renegotiate the contract.

5. On February 21, 1961, the City Council adopted a resolution reciting that the contract had terminated and au-

thorizing the mayor to negotiate for the employment of consulting engineers to develop plans for sewer improvements.[2] Scharz promptly wrote Sharp a letter quoting that resolution.

6. The City Council thereafter formed a sewer committee to solicit proposals from engineering firms for completion of the work. Among those so solicited were Mr. Riddle and the firm of Haskins, Sharp and Ordelheide. Sharp, on behalf of his firm, replied by letter dated May 24, 1961, that "in our opinion we have a contractual arrangement with North Kansas City," and declined to submit a new bid. By another letter written by its attorney the partnership again asserted its willingness "to continue the performance required under the contract."

Judge Collinson found:

"* * * [T]he evidence also discloses that Mr. Riddle, the retired partner, was attempting to secure a contract for the balance of the work for another engineering firm which would then make him a member. The Mayor and Mr. Riddle were evidently quite friendly and he had every assurance that he would receive the work. And the other firm, on its promise to take in Mr. Riddle, was recommended by the Mayor for employment at a substantially higher fee than that provided in the original contract.

"Before the recommendation was accepted however a City Council fight developed, there were accusations made by City Council members against the Mayor, the firm recommended withdrew their offer, and the Mayor resigned. Thereafter an engineering firm with which neither Mr. Riddle nor Mr. Sharp were connected was employed by the City to complete, and did complete, the balance of the work contemplated by the original contract."

The engineering firm employed to do the balance of the work was Black & Veatch.

*The authority of the City to enter into the contract.* The City's argument here is that it cannot be held to be bound on the contract because the plaintiff failed to plead and prove that the person executing the agreement for the City was duly authorized so to do in writing, as required by the Missouri Constitution and statutes.

Mo.Const. art. 3, § 39(4), V.A.M.S., specifies that the general assembly shall not have power to authorize the payment of any claim against a municipal corporation under any agreement "made without express authority of law." Mo.Rev. Stat. § 432.070, in obvious implementation of the constitutional provision, states:

"No * * * city * * * shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law * * * and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

---

2. "In view of the fact that the partnership of Haskins, Riddle & Sharp is no longer functioning under the supervision of Mr. Riddle and Mr. Sharp collectively, it is the feeling of the Council that this works a termination of any previous understandings between said engineering firm and the City of North Kansas City. In further view of the fact that the firm of Haskins, Riddle & Sharp has completed all phases of the work contemplated in their letter of intention dated November 12, 1957, and that nothing is left to be done as contemplated in the aforesaid letter of intention without further direction of the City of North Kansas City, Missouri; the former members of the firm of Haskins, Riddle & Sharp should be notified that they will not further be required to perform any additional engineering work and that the Mayor be authorized to enter into negotiations for the employment of consulting engineers for the purpose of developing plans for the construction of storm and sanitary sewer improvements and incinerator and sewage treatment works."

And § 77.090, relating to cities of the third class, such as North Kansas City reads:

"The council shall cause to be kept a journal of its proceedings * * *."

■ The Missouri courts, of course, have held these provisions to be mandatory and have also held that contractors are charged with notice of the restrictions imposed on municipal officials to contract on behalf of their municipality. Thies v. St. Louis County, 402 S.W.2d 376, 380 (Mo.Sup.1966); Needles v. Kansas City, 371 S.W.2d 300, 306 (Mo. Sup.1963); Burger v. City of Springfield, 323 S.W.2d 777, 782 (Mo.Sup. 1959); Donovan v. Kansas City, 352 Mo. 430, 175 S.W.2d 874, 879 (1943), 179 S. W.2d 108 (1944), appeal dismissed, 322 U.S. 707, 64 S.Ct. 1049, 88 L.Ed. 1551. See City Water Co. v. City of Chillicothe, 207 F. 503, 509 (8 Cir. 1913), cert. denied, 231 U.S. 753, 34 S.Ct. 322, 58 L.Ed. 467. Thus the contract, to be valid and not void, must be one "expressly authorized by law," must be within the power of the municipality, must be for a consideration to be performed subsequent to the making of the contract, must be "in writing and dated when made", and must be subscribed by the parties "or their agents authorized by law and duly appointed and authorized in writing", and the city council shall keep "a journal of its proceedings."

The City here asserts that the plaintiff by his pleadings merely alleged a contract and attached a copy of the agreement as an exhibit; that, while the agreement bears the signature of the mayor, there is no pleading or proof of an authorizing ordinance; that the City's answer pleaded a failure to state a cause of action coupled with a general denial; that the mayor testified the contract was not passed by city ordinance; and that a Missouri municipal legislative body may not delegate a legislative function. It cites, among other cases, Arkansas-Missouri Power Co. v. City of Kennett, 78 F.2d 911, 920 [922] (8 Cir. 1935) [modified, 80 F.2d 520]; State ex rel. Prichard v. Ward, 305 S.W.2d 900, 902 (Mo.App.1957); Pfitzinger v. Johnson, 177 S.W.2d 713, 720–721 (Mo.App. 1944); Donovan v. Kansas City, supra; Fulton v. City of Lockwood, 269 S.W.2d 1 (Mo.Sup.1954); and State ex rel. Barkwell v. Trimble, 309 Mo. 546, 274 S.W. 683, 684 (1925).

Certain of the above stated requirements for a valid contract by a Missouri municipality are clearly met here with respect to the 1957 agreement. The contract's subject material is concededly within the City's powers. The consideration was subsequently to be performed. The contract was in writing. It was dated. It was subscribed by persons purporting to act for the respective parties. This leaves, at most, only the requirements of legal and written authorization and the supporting council journal entry.

■ We readily decide this authority question in favor of the plaintiff. We do so in view of a number of factors which we consider in the aggregate: (1) The City's answer, asserting, on this issue, only a general denial and a failure to state a cause of action, did little or nothing to bring the issue to the attention of the trial court. (2) At oral argument the City conceded that the issue was not litigated at the trial level. (3) The contract was specifically pleaded by the plaintiff as having been "entered into" by the partnership and the City and a copy thereof was attached to the complaint; the existence of the contract and the exactitude of the exhibit, except as to the general denial, were not denied or otherwise challenged by the pleadings. (4) The contract on its face exudes regularity and seeming compliance with § 432.070; it recites that the City enters into it "through its duly constituted authorities"; it is signed by the mayor, attested by the city clerk, and "approved as to form and legality" by the city attorney. (5) Exhibit S, a letter dated November 15, 1957, from the City Clerk to Haskins, Riddle and Sharp, forwards to the partnership a copy of the 1957 agreement which, it is said, "was approved by the Mayor and City Council

in its regular meeting on Tuesday evening, November 12, 1957"; the letter also states that the mayor wished to discuss "as soon as possible" the "arrangements for a meeting to present your report." (6) At pretrial the City, on the request of the plaintiff, specifically admitted that,

"On November 12, 1957 the defendant entered into a contract with the firm of Haskins, Riddle and Sharp, consulting engineers,"

and the plaintiff, *upon request of the City*, specifically admitted that:

"The contract between the plaintiff and defendant, dated November 12, 1957 was in words and figures as follows:"

(7) The City does not deny the existence of an ordinance or council journal. (8) The City, in its council resolution of February 21, 1961, by which it asserted the termination of the 1957 agreement, appears again to concede the agreement.

All this discloses, we feel, that the contract's existence and validity are admitted by the pleadings and by the pretrial and are demonstrated by the evidence and that the issue, raised here but not in the trial court, has assumed the character of an afterthought. We hold that the plaintiff adequately made at least a prima facie showing of the contract's existence and validity and that this showing placed the City in the position where it was required to go forward with any evidence to the contrary. This it did not do. The issue, therefore, must be, and is, resolved in favor of the plaintiff.

*The assignability of the contract.* The City's argument is that the Haskins, Riddle and Sharp partnership was one of professional people; that upon the assignment of a partner's interest in a contract with a client, the client has the option to abrogate the contract; that professional service is a very personal matter; that civil engineers are to be classified, in this respect, with attorneys, citing 6 Am.Jur.2d Assignments §§ 11–13 (1963), 5 Am.Jur.2d Architects §§ 7 and 8 (1962), 50 Am.Jur. Surveyors and Civil Engineers § 3 (1944), some cases concerning lawyers, and, in particular, Smith v. Board of Educ., 115 Kan. 155, 222 P. 101 (1924), which had to do with an architects' partnership, the retirement of one of the two partners, his replacement by another, and the Board's refusal to continue with the firm.

The City would buttress this legal argument with references to (a) the testimony of Mayor Scharz to the effect that it was difficult to work with Mr. Sharp, that he was obnoxious to some people in the city government and took unfair advantage, that Sharp had had trouble with the Board of Public Works, and that the City had had difficulty with a pumping station Sharp designed, and (b) the testimony of Councilman Ellington that the City did not wish to do business with Sharp because he got into arguments with city officials.

Judge Collinson, in his memorandum said,

"The City argues that, since engineers are also professional men, this situation is analogous. This might be a difficult question to resolve if there was any evidence in the case that, first, the City had relied solely or principally upon the skill and experience of Mr. Riddle when the contract was executed, or, second, that Mr. Sharp was not competent, sufficiently experienced, or in some other manner not qualified to carry on the work. As to the first point the record is silent, and as to the second point, the evidence of the City's own witnesses was exactly to the contrary."

He then went on to hold that "[u]nder the particular facts of this case, and with very little precedent for guidance," the City's actions and its employment of other engineers effected a breach of the 1957 contract. The court's reference to the testimony of the City's own witnesses relates to (a) Scharz' testimony that Sharp was an able and capable engineer, that he and Sharp got along well, and that Sharp's taking advantage of people

was because Sharp was strong with people and was based on hearsay, and (b) Ellington's testimony that he did not know Sharp, and that it was the mayor who said at the meeting that he could not get along with Sharp.

Despite the trial court's concern with the paucity of precedent, we have no difficulty in agreeing with its conclusion on this issue. We may, of course, generally accept the City's statement as to the law with respect to professional service contracts and, without deciding, we may assume for present purposes that professional engineers, in contracting for sanitary sewer work, come within that classification. But this acceptance and this assumption do not provide or compel an answer favorable to the City.

■■■ Missouri has adopted the Uniform Partnership Act. Section 29 thereof, Mo.Rev.Stat. § 358.290, reads:

> "The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."

Section 30, Mo.Rev.Stat. § 358.300, reads:

> "On dissolution the partnership is not terminated but continues until the winding up of partnership affairs is completed."

Section 31, Mo.Rev.Stat. § 358.310, lists the causes of dissolution. Among these are death and bankruptcy of a partner and "By the express will of all the partners * * *." Although there is a presumption of a partnership's continuance, Citizens' Trust Co. v. Tindle, 194 S.W. 1066, 1068 (Mo.App.1917), we do have here the fact of the three partners' agreement as of December 31, 1960, providing for Riddle's withdrawal, and Missouri case law that partners by mutual assent may dissolve or modify their partnership relation. Cazel v. Alledine, 360 Mo. 1, 226 S.W.2d 729, 730 (1950); Schneider v. Newmark, 359 Mo. 955, 224 S.W.2d 968, 971 (1949). Further, the

dissolution of a partnership does not abrogate existing contracts to which it is a party. Armstrong v. Henley, 182 Mo. App. 320, 170 S.W. 402 (1914); Prater v. Rush, 228 Mo.App. 922, 74 S.W.2d 875 (1934); Fenix v. Celebrezze, 243 F. Supp. 816, 823 (W.D.Mo.1965). In the latter case Judge Becker utilized, in a case applying Missouri law, generally accepted hornbook statements that a dissolution of a partnership does not become effectual as to third persons until actual notice; that after dissolution a partnership is considered as maintaining a limited existence for the purpose of making good all outstanding engagements; that this principle is recognized in the Uniform Partnership Act; and that dissolution does not relieve the partners from their liability for performance of contracts theretofore made. 68 C.J.S. Partnership § 352 (1950); 40 Am.Jur. Partnership §§ 264 and 266 (1942). And Judge Collinson pointed out in his first memorandum that in Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 508 (1952), the court observed, with respect to a partnership agreement among consulting engineers, "Surviving partners usually have an obligation to complete the executory contracts of a partnership."

■■■ It seems clear enough from these authorities that, as Judge Collinson put it, "the City could have called upon the partners to complete the contract." Of course, the City's rights against the partnership with respect to any executory contract do not necessarily measure the corresponding rights of the continuing partners against the City. But here, again, an aggregation of items convinces us of the rightness of Judge Collinson's conclusion: (1) The primary reason advanced by the City in its resolution of February 21, 1961, purporting to terminate the agreement is not the dissolution of the old partnership but something very different, namely, "the fact that the partnership of Haskins, Riddle & Sharp is no longer functioning under the supervision of Mr. Riddle and Mr. Sharp collectively." The

City's theory of right to abrogate upon dissolution thus is a shift in position and it, too, has the appearance of an afterthought. (2) The trial court found, and the finding is not challenged by the City, that Riddle functioned collectively as a partner of the old firm even into 1963. (3) Although the City claims it was not so advised, there is evidence in the record that Riddle agreed to hold himself available to complete contracts outstanding between clients and the firm and that, if asked to do so, he would have worked with Sharp and Ordelheide on the city contract. (4) The 1960 agreement among the partners made no mention of the contract with the City, and it contained no purported assignment of the city contract. (5) The essence of the professional service cases is that the critical partner, for one reason or another, is no longer available to render those services. Here the critical partners were available and the record indicates, despite the weak and meager initial intimations of Scharz and Ellington to the contrary, that they were able to, and did, function collectively. (6) The record supports the trial court's finding as to the acceptable professional capacity of the plaintiff Sharp and, indeed, of his ability to get along with clients including persons in the city government. (7) Judge Collinson's findings, quoted above, as to the underlying manipulations between Scharz and Riddle tell a sorry story and reveal what was really going on. (8) The suggestions as to Sharp's incapacity and inability to get along with people in the city government are not consistent with the fact that Haskins, Sharp and Ordelheide was one of the engineering firms which the City solicited to bid for the completion of the work.

The whole deal has, for us, somewhat less than an appetizing aroma and one which is not cured by high-sounding arguments of partnership employment based on "concepts of moral values, code of professional ethics, and creativity."

*The termination of the contract.* The focus here is particularly on paragraph 6, quoted above, of the 1957 agreement.

"When so instructed by the City" the engineers were to prepare complete bid documents and detailed plans and specifications.

The City takes the position that the contract was a severable one; that it was divided into the two parts of preliminary phase services and design and supervision services, respectively; that services for each part were separately compensated; that the "when so instructed" language is a condition; that that condition was never fulfilled; and that the condition was there so that, when the estimates came in, the City could take a new look and decide then whether it could afford the project or perhaps have it done more cheaply elsewhere. In sum, the City argues, the contract could be terminated by either party at the conclusion of the first phase.

The City argues, in further detail, that this conclusion is compelled by any fair construction of the terms of the contract itself; by looking at the subject matter; by the attendant circumstances, namely, the need of a bond election, the City's public character, and the ever present change, with time, in its officials; and by the obvious divisibility of the consideration paid for the work. See Knapp v. Strauss, 227 Mo.App. 822, 58 S.W.2d 805 (1933). It is said that the plaintiff was not deprived of any of the fruits of his labor and that he had not done any work for which he was not paid.

Judge Collinson, in ruling in favor of the plaintiff on this issue said:

"It is obvious why the contract was divided into two parts. If either the bond issue failed or the Federal grant was not obtained, the project was ended. The City was not obligating itself to pay for complete plans and specifications for a sewer system that could not be built. But it is equally obvious that if the City proceeded with the construction, this contract was a definite contract of employment of the plaintiff to complete the work."

We agree. We, too, feel that the "when so instructed" clause is not a provision of severability but is one which has its emphasis on when the work shall begin and is a protective feature for the City in the sense that the municipality naturally should not be committed if the pre-bond election were unfavorable or if the needed federal grant were not obtained. But each of these factors was favorably resolved, and the contract remained effective for the balance of the engineering work when all was ready to proceed. We note, in particular, that Mayor Scharz testified that, when the 1957 agreement was executed, no suggestion that any other firm might finish the work was made; that Councilman Ellington testified that it was the mayor or the city attorney who made the suggestion that the contract be terminated; that this was after the bond issue had passed; that the 1957 agreement is a single document covering a single project; that the very numbering of its paragraphs concerning services by the engineers continues through both the preliminary and the design and supervision phases and does not begin anew with the latter; that the compensation provisions follow as still another numbered paragraph and are not divided, as to their place in the contract, among the two phases; and that paragraph 5, which relates to the federal grant, concerns not only assistance to the City in obtaining it but, as well, "any additional work required in administering the project under the grant program." We agree emphatically with the plaintiff that the word "when" as used in the phrase "when so instructed" means precisely "when" or "at the time that" and is not a condition. Were it a condition, the contract surely would have been more specific in its phraseology and more clearly to that effect. The phrase embraced only a timing aspect. It did not give the City a right to turn elsewhere for the remaining engineering services. Once the City decided to proceed it was obligated to stay with the plaintiff. We need not decide whether, with the bond issue passed and the federal grant obtained, the City was obligated under the contract to proceed. We hold only that once it went ahead, as it did, it was subject to the 1957 agreement.

*Damages.* Error is asserted (1) in "allowing more damages to the plaintiff than the actual profit realized on the job" by Black & Veatch who did the work, (2) in disallowing, in determining net profit, an amount for the salary of a project manager, (3) in allowing costs against the City, and (4) in allowing interest on the judgment.

The parties are agreed that the measure of damages is the loss of profits Sharp would have realized had he been permitted to complete the contract. The gross he would have received is specified by the agreement and is not in dispute. The problem is to ascertain the net. The plaintiff maintained his office and staff throughout the period of the project and engaged in other engineering work. However, his gross declined substantially during the project years as compared with years prior thereto.

1 and 2. Judge Collinson found that the gross profit (gross income less actual project costs) of Black & Veatch on the job was $168,038.69. There appears to be no challenge to this figure. The argument then centers, first, in the inclusion among actual project costs of a project manager's salary of $12,535.75 and, second, in the determination of the appropriate amount, to be allocated to the job, of the plaintiff's own general operating or overhead expenses. The trial court refused to permit the deduction of the manager's salary in the determination of what the plaintiff's net would have been and did so on the ground that Black & Veatch was a corporation and that Sharp, not being incorporated, would have performed that work himself in about 10 hours a week. The court examined the plaintiff's gross income and operating expenses of past years and the relationship between them and concluded that 27 per cent of the gross for the project period of 4 years was a realistic appraisal of operating ex-

penses if the plaintiff had enjoyed the project income.

█ It is now conceded that the court's finding that Black & Veatch was a corporation is erroneous, and it is acknowledged that that firm was a partnership. Although the employment of a project manager on a 4-year project of this kind would appear to us not to be an unreasonable step or precaution, we cannot conclude that Judge Collinson's determination that the plaintiff would have done that supervisory work himself and, with the decline in his other business, would have had the 10 hours per week to do it, is clearly erroneous. We might have reached the opposite conclusion, but we are in no position to say that the trial court must be reversed as to this detail. Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 138 A.2d 568, 572–573 (App. Div.1958). Cf. Partridge v. Norair Eng'r Corp., 112 U.S.App.D.C. 165, 301 F.2d 247, 250–251 (1962).

█ Although, as to the operating expense percentage, we suspect that the trial court split the difference between the plaintiff's contentions and those of the defendant, here again we are not persuaded that his determination was error. Instead, we feel that the record is supportive of his conclusions.

3. The City's argument as to interest centers in Mo.Rev.Stat. § 95.315 which requires that all claims against a city of the third class be presented in writing and verified and "no claim shall be audited or allowed unless presented and verified as provided in this section." It is then pointed out that the complaint by which the plaintiff instituted his lawsuit is not verified.

█ We are not convinced. The statute, it seems to us, is directed to a situation entirely different than the one which confronts us here. Its obvious purpose is to afford the municipality a reasonable opportunity to investigate and settle and thereby to avoid costs incident to litigation. Hill v. City of Sedalia, 64 Mo.App. 494 (1896). And it

has been held that the statute speaks only of claims which "could be presented in the way described" and was intended to apply only to claims of that type. Cropper v. City of Mexico, 62 Mo.App. 385, 387 (1895). Certainly, here the City possessed all possible information about the claim asserted by the plaintiff and had full opportunity to investigate that claim. The statute has no purposeful application to this situation, and to deny plaintiff costs because of the statute would do him an injustice. We note, in this connection, that the Missouri court concluded, many years ago, that the statute was not intended to apply to actions ex delicto. Haggard v. City of Carthage, 168 Mo. 129, 67 S.W. 567 (1902). We follow that example as to the statute's less-than-universal application.

█ 4. The trial court's award of interest against the City is opposed on the basis of the same statute and because, it is said, the plaintiff did not ask for interest in the prayer by which he concluded his complaint. What we have said above as to the statute has equal application with respect to the interest detail. And the complaint's prayer concludes with the words "and for all proper relief." Clearly, interest qualifies as "proper relief."

Affirmed.