Wallice HAMMOND and Earl E. Roberts, Executors of the Will of Cooper S. Hammond, Deceased, Plaintiffs-Respondents,

v.

Charles C. WHEELER, Executor of the Will of Clara Wheeler Hammond, Deceased, Defendant-Respondent, Wallice Hammond, Mary Hammond, Mollie Millsap, Cooper S. Hammond, Ethel Bay, Virginia Amis, Thomas B. Hammond, and Joseph H. Hammond, Defendants-Appellants.

No. 48498.

Supreme Court of Missouri,

Division No. 1.

July 10, 1961.

William C. Connett IV, William M. Van Cleve, St. Louis, for all defendants-appellants. Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

Thompson & Shewmaker, Richard D. Shewmaker, Bernard N. Frank, St. Louis, for respondent Charles C. Wheeler.

COIL, Commissioner.

Cooper S. Hammond died testate in 1954 survived by his widow, Clara Wheeler Hammond, and left no children or other descendants. His widow died in 1958. Respondents Wallice Hammond and Earl Roberts, executors of Cooper's will, brought this declaratory judgment action. Charles Wheeler, who was a defendant below and is a respondent here, is executor of Clara's will, and certain defendants below and appellants here are the heirs and, as such, the residuary legatees, under Cooper Hammond's will. Clara renounced her deceased husband's will and elected to take the share

provided for her in that event by then applicable section 469.090(2), RSMo 1949 (repealed, Laws Mo.1955, p. 385, § A), V.A. M.S.; c. 475 Appendix, which provided that she receive "one-half of the real and personal estate belonging to the husband at the time of his death, absolutely, subject to the payment of the husband's debts."

The first question is what portion of the federal estate tax on Cooper Hammond's estate is properly allocable to his widow's share of his estate. The answer to that question depends upon whether a surviving spouse who has renounced her decedent spouse's will takes the amount of the marital deduction provided for in the federal estate tax law free of any burden to pay federal estate tax by reason of having received that share.

The parties agree that Clara's statutory one-half share of her deceased husband's estate qualified for the marital deduction and that she received from her husband (part of his gross estate for federal estate tax purposes) an additional sum of $38,773.-43 consisting of life insurance proceeds, jointly-held property, and an allowance for a year's support. The trial court found that Mrs. Hammond took the statutory one half "free and clear of any charge for Federal Estate Tax, except she should pay as much of the federal tax as may be allocable to that portion of her husband's property passing to her which does add to the amount of such tax * * *."

■ The pertinent provisions of the 1939 Internal Revenue Code, as amended in 1948, applicable to this case,[1] 26 U.S.C.A. I.R.C. 1939, as amended, §§ 810, 811, and 812, pp. 380–397, impose a tax on the transfer of a decedent's net estate (called "taxable estate" in the 1954 Code). To determine the "net estate" the value of the decedent's "gross estate" is first determined by including the value of specified assets and by deducting from the value of the "gross estate" so determined an amount as an exemption and other amounts as deductions for specified items. One such deduction, called the marital deduction, is an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse up to an amount equal to 50 per cent of the value of the "adjusted gross estate." (The adjusted gross estate is the value of the gross estate less the value of the amount of the deductions; the exemption is not deducted.) The marital deduction was enacted along with changes in the law as to income taxes and gift taxes, in an attempt to provide or to enable states to provide for equality in taxation among the residents of community-property states and noncommunity-property states. An effort had been made to eliminate the inequality by certain 1942 amendments, but those proved unsatisfactory and, consequently, in 1948, the marital deduction was proposed and enacted to enable residents of common-law states to have equality with residents of community-property states in so far as concerned the assessment and burden of the federal estate tax. See 2 U.S. Code, Congressional Service, 1948, pp. 1188–1190 and 1270–1272.

■ It is apparent that the 1948 marital deduction feature intended to and did enable the states to permit a decedent to pass half of his net estate to his surviving spouse free of federal estate tax (with certain exceptions not applicable here set forth in §§ 826(c) and 826(d), 26 U.S.C.A. I.R.C. 1939, p. 405). It is equally apparent, however, that the Code did not specify but was silent as to who was to bear the ultimate burden of the federal estate tax. In Fernandez v. Wiener, 326 U.S. 340, 345, 66 S.Ct. 178, 181, 90 L.Ed. 116, the United States Supreme Court said: "The revenue laws make no provision for the distribution of the burden of the tax beyond providing that the tax shall be a lien on all of the property included in the decedent's gross es-

---

1. The 1948 applicable provisions are essentially the same as the 1954 Code provisions. See 26 U.S.C.A. I.R.C.1954, § 2001 et seq., particularly § 2056.

tate. Section 827(a) I.R.C., 26 U.S.C. § 827(a), 26 U.S.C.A.Int.Rev.Code, § 827(a). See Detroit Bank v. United States, 317 U.S. 329, 331–333, 63 S.Ct. 297, 87 L.Ed. 304. Section 826(b) of the I.R.C., 26 U.S.C.A. Int.Rev.Code, § 826(b), contemplates that the tax 'be paid out of the [taxable] estate before its distribution,' unless otherwise directed by decedent's will. Although the share of the surviving spouse is subject to the lien and the tax must be paid out of the estate as a whole, the federal statute leaves it to the states to determine how the tax burden shall be distributed among those who share in the taxed estate. See Riggs v. Del Drago, 317 U.S. 95, 63 S.Ct. 109, 87 L.Ed. 106."

Consequently, the fact, standing alone, that a surviving spouse's share of the deceased's estate constitutes a marital deduction does not mean that the surviving spouse should or should not pay a portion of the federal estate tax assessed on the decedent's net or taxable estate.

It is clear that a surviving spouse who renounces his deceased spouse's will takes only that which is provided by the applicable Missouri statute. It is appellants' contention that the then applicable state statute quoted above, RSMo 1949, § 469.090 (2), reasonably construed, meant that the surviving widow's one-half share was one half the estate which remained after the payment of the federal estate tax; that the word "debts" included in the phrase "subject to the payment of the husband's debts" encompassed all taxes including the federal estate tax. Appellants concede that technically a tax is not a debt, but argue that because RSMo 1949, § 464.010(3),[1] relating to classification of demands (repealed Laws Mo.1955, p. 385, § A), provided in part, "All debts, including taxes due the state or any county or incorporated city or town," the word "debt" as used in section 469.090(2) had a broader meaning than simply the contractual obligations of the decedent. Appellants cite State ex rel.

Karrenbrock v. Mississippi Valley Trust Co., 209 Mo. 472, 108 S.W. 97, for the proposition that a tax is not a debt in a strict sense, but they fail to point out that the court in that case, referring to the identical argument made with respect to the same language in the classification statute (§ 184 RSMo 1899), said 108 S.W. at page 101: "* * * the dominant idea of that section is classification of demands against estates, not the definition of taxes or debts, and the third subdivision (unfortunately punctuated) is merely a direction that all debts due the state or any county or incorporated city or town, together with taxes due the one or the other, should be put in the third class of demands and paid accordingly."

To further support their contention, appellants rely on three Missouri cases. In re Rosing's Estate, 337 Mo. 544, 85 S.W.2d 495, held that the entire federal estate tax paid by an estate was to be deducted in computing the Missouri inheritance tax. In the case of In re Bernays' Estate, 344 Mo. 135, 126 S.W.2d 209, 122 A.L.R. 169, it was, as appellants say, held that a wife's interest in her husband's personalty, except for absolute allowances, is subject to the payment of her husband's debts. We think it is apparent that neither of those cases is controlling or particularly helpful in determining the meaning of the phrase in question in the present case. In re Poe's Estate, 356 Mo. 276, 201 S.W.2d 441, 443, as appellants correctly state, pointed out that the federal estate tax is on the interest of the decedent which has ceased by reason of his death and that the tax is payable initially out of the personal assets in the hands of the executor. We cannot agree with appellants, however, that the holding in the Poe case constituted an interpretation that the word "debts" as used in section 469.090(2) included "costs of administration and Federal estate taxes." In the Poe case, the decedent's widow was entitled to dower in the real and personal property of her deceased husband and to

1. Now V.A.M.S. § 473.397(4).

other statutory allowances. There was both real and personal property. In their final settlement the executors took credit for real estate taxes paid which had been assessed in 1942 and were payable in 1943, the year of the testator's death, and also took credit for the full federal estate tax which they had paid. The executors proposed to distribute to the widow one half of the net personal estate remaining after the payment of "debts, taxes and expenses of [the] administration." The widow's contention as to the federal estate tax was that a pro rata part of it should have been allocated to the real estate which had passed to her deceased husband's beneficiaries. She assigned various reasons in support of her contention. All those reasons tended to support the argument that equitably, federal estate taxes should be apportioned among all the beneficiaries who received property from a decedent, and not paid in full from the personal property.

In disposing of that contention, this court pointed out that the widow had elected to raise the question in the probate court by filing exceptions to a final settlement rather than to have pursued an equitable remedy in the circuit court with all the parties there, and thereby had precluded this court from adjudicating the question whether those who received real estate should have borne a share of the tax. This court said at 201 S.W.2d 445: "Whether the matter of apportionment of the tax is for the legislature or for the courts in a proper case is a matter we may not determine in this proceeding. See 40 Col.Law Review 690, 701; Edwards v. Slocum, 264 U.S. 61, 44 S.Ct. 293, 68 L.Ed. 564, 565. We can only determine the issues presented on the record and we, therefore, hold that the respondents properly paid the Federal estate taxes from the personal assets under their possession and control; and that they were entitled to take credit therefor in their final settlement." In the light of the foregoing it seems reasonable to say that In re Poe's Estate, supra, is not decisive or persuasive in determining whether the phrase "the husband's debts," included the federal estate tax.

It seems to us that the word "debts" used in certain contexts might reasonably be construed to include taxes of all kinds, including federal estate taxes, because taxes are akin to debts in determining the residue for distribution. But we find nothing to indicate that the word "debts" was so used in the statute in question. On the contrary, as we have noted, this court has said that the federal estate tax is not a debt in a "strict sense," In re Poe's Estate, supra, 201 S.W.2d 444, and we have held that "debts" usually mean those due by the deceased or expected to be due in deceased's lifetime, Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 129 S.W.2d 905, 909 [13–15]. And in the case of General Assembly of Presbyterian Church, etc. v. McElhinney, 61 Mo. 540, at page 543, the court said: "Under our statute respecting administration, and the repeated adjudications of this court thereon, probate courts possess no power to allow any claims against a decedent's estate, or to order the sale of land belonging thereto, except for the payment of the debts of the deceased, i. e., those in existence at the date of his death." The court in Callaway v. Title Guaranty & Trust Co., 132 Mo.App. 466, 111 S.W. 905, distinguished between "any and all claims" and "debts" and, in that respect, said 111 S.W. at page 906: "Defendant seeks to make the words 'any and all claims' mean no more than all debts, and then it is sought to show, with good force of reasoning, that debts are understood to mean debts against the estate, as distinguished from the expense of administration. It is readily conceded that debts against an estate are ordinarily understood to mean debts which were owed by the intestate. But a claim against an estate can with no show of reason, nor by any understanding arising from common parlance, be said to be so restricted. Funeral expenses, current taxes, etc., constitute claims, and so, necessarily, does the lawful expense of administration, including commission for the administrator."

We are of the opinion that the words "husband's debts" as used in section 469.090(2), supra, were not intended to and did not include the federal estate tax which was not an obligation of decedent during his lifetime, and we therefore hold that the section in question was not determinative of the question whether the widow in this case was obligated for any part of the federal estate tax, or whether her one-half share should be distributed to her undiminished by any deduction for the payment of the federal estate tax.

Our aforestated opinion is unaltered by the cases from other jurisdictions upon which appellants rely in support of their contention. We refer briefly to some of those cases, each of which held that the respective state statute which fixed a widow's rights upon renunciation of a will, properly construed, compelled the conclusion that the federal estate tax should be deducted before computing the widow's share for distribution. In In re Uihlein's Will, 264 Wis. 362, 59 N.W.2d 641, 648, 38 A.L.R.2d 961, the statute considered provided in part that the widow's share "of personal estate which she may so take shall not exceed the one-third part of his net personal estate." Stats. § 233.14. The court held that the words "net estate" were clear and unambiguous and meant that part of the estate which remained after the payment of all charges against the estate including federal estate taxes.

The North Carolina Supreme Court in Wachovia Bank & Trust Co. v. Green, 236 N.C. 654, 73 S.E.2d 879, construed its state statute which provided in part that the renouncing widow was to receive one half of the personal estate of decedent spouse as her distributive share and directed that the personal representative distribute the surplus in the manner provided in the statute. The court construed the word "surplus" to mean personal property left after the payment of the debts of deceased, including taxes.

In Northern Trust Co. v. Wilson, 344 Ill. App. 508, 101 N.E.2d 604, 606, the Illinois court construed its statute, Ill.Rev.Stat.1949, c. 3, § 168, which provided in part that the renouncing widow took one third of the personal estate and one third of the real estate "after payment of all just claims." The court held that "all just claims" included federal estate taxes and was not restricted to claims that the decedent had created before his death.

In Campbell v. Lloyd, 162 Ohio St. 203, 122 N.E.2d 695, the Supreme Court of Ohio reversed its case of Miller v. Hammond, 156 Ohio St. 475, 104 N.E.2d 9, written not quite three years theretofore, and held that the Ohio statute of descent and distribution under which a widow renouncing a will took required a construction which meant that the property to be distributed to her should be diminished by the payment of the federal estate tax.

In Guaranty National Bank v. Mitchell, 111 S.E.2d 494, 497, the Supreme Court of Appeals of West Virginia construed a statute, Code 42–2–1, which provided in part that a renouncing widow was entitled to one third of the estate "after payment of funeral expenses, charges of administration and debts" as including "all proper charges," and said that whether the federal estate tax be considered a debt, a claim, or an expense of administration was immaterial.

To the cases cited and relied on by appellants should be added the case of Old Colony Trust Co. v. McGowan, 156 Me. 138, 163 A.2d 538, 541, where the initial question was to construe a Maine statute, R.S.1954, c. 170, § 20, which provided that a renouncing widow's fractional share of the personal estate was subordinated to the debts of the estate, the funeral charges, and the charges of settlement. The court said it was satisfied that the federal estate tax was not included in the category of debts but that the tax was included within the statute's language, "charges of settlement."

We shall refer again to some of the above-mentioned cases in connection with the question of the propriety of applying equitable principles in determining whether a renouncing spouse should pay any portion of a federal estate tax by reason of receiving a share which does not contribute to that tax, but none of them persuade us to a different construction of "subject to the payment of the husband's debts," as used in section 469.090(2) RSMo 1949.

It is our view, therefore, that the then applicable statute was not a bar to the application of equitable principles in deciding whether a renouncing widow's one-half share (which qualifies as a marital deduction) should be determined prior to the payment of the federal estate tax.

In at least seventeen states there are statutes providing for the apportionment of the federal estate tax. Those statutes in the main were intended to prevent the burden of the federal estate tax from falling on residuary legatees and to cause each person who took from a decedent to pay that part of the tax which accrued by reason of the value of the property which he took. Most of those statutes, either specifically or as construed by the courts, provide that any deduction allowed the surviving spouse shall inure to the benefit of such spouse and, thus, that the surviving spouse pays no federal estate tax by reason of the fact that he received a portion of his decedent's estate which constituted a marital deduction. Missouri has no apportionment statute. It was the rule in many states prior to their adoption of apportionment statutes that the federal estate tax fell upon the residuary legatees. This court, in Carpenter v. Carpenter, 364 Mo. 782, 267 S.W.2d 632, rejected appellant's contention that "under Missouri law the federal estate tax must be borne ultimately by the residuary legatees, unless the will directs otherwise." 267 S.W.2d 639. At pages 640 and 641 of the Carpenter opinion the court pointed out that under the law of some other states the ultimate burden of

the federal estate tax fell on the residuary estate and that some courts had held that such general rule was based on an erroneous concept of the federal estate tax. This court then discussed two other rules, applied in various states, but recognized none of the three as the Missouri rule. We are of the view, therefore, that it reasonably follows from the opinion in the Carpenter case that there is no established rule in Missouri which interferes with or is inconsistent with the application of equitable principles in determining the ultimate burden of the federal estate tax.

In Carpenter v. Carpenter, supra, of the total federal estate tax paid by the executor some $21,000 was due by reason of the receipt by the widow of a nonprobate asset, viz., an annuity contract which by the federal estate tax law had to be included in decedent's gross estate. Mrs. Carpenter's interest in that annuity was some $122,000 while the contingent interest of each of her two sons was about $3,300. The court stated the question for decision was: " * * whether the ultimate burden of the federal estate tax attributable to the value of the annuity contract shall be borne by the beneficiaries of the annuity contract in accordance with their respective interests therein, or shall be borne by the probate estate of decedent and charged against the residuary legatees in accordance with their interest in the residuary estate." 267 S.W. 2d 636. If each paid a proportionate part of the tax in accordance with his respective interest, the widow would pay about $20,500 and each son would pay about $560, whereas if the tax was paid out of the residuary estate the widow and the sons would each pay about $7,200. The court, after a full review of the nature of the federal estate tax and of the matters heretofore discussed in this opinion, concluded that inasmuch as all the interested parties were before the court in that declaratory judgment action and inasmuch as the will "expressed no clear intent as to who should bear the ultimate burden of the estate tax attributable to the non-testamentary property," the is-

·sues were determinable upon equitable principles. The court said, 267 S.W.2d 642: "Prorating the federal estate tax in this case between the testamentary estate and the non-testamentary estate seems to provide a fair and impartial basis for distribution of the tax burden in question where the testator in his will has not (in our opinion) otherwise provided except as to devises and bequests under the will. We have seen that there is nothing in the federal estate tax statutes to prevent a proper application of equitable principles to prevent injustice, where the tax is based upon both testamentary and non-testamentary property. * * * In equity and good conscience nothing appears from this record to require the residuary legatees under the will to bear the ultimate burden of federal estate tax, which was based upon both probate and non-probate property. It is our conclusion that the federal estate tax should be prorated, as stated, and that the beneficiaries of the annuity should pay the tax attributable to their respective interests therein."

It appears that the basic principle involved in the disposition of the Carpenter case was that each of those who took property from the decedent (where decedent's intent did not appear to the contrary) should bear his share of federal estate tax by paying that part of the tax which accrued because of the value of the property he received. It is apparent, however, that the problem in the Carpenter case involved what we choose to call a true apportionment question in that each of the parties involved was receiving property from the decedent and each was bearing a portion of the tax. We recognize, of course, that the question involved in the present case is factually quite different from that in the Carpenter case. The significance, as we see it, of that case in deciding the present one is that the court in the Carpenter case, under circumstances where there was no statute or rule to prevent it, recognized that it was feasible and desirable to apply equitable principles in determining the incidence of the federal estate tax in order to prevent an injustice which would otherwise occur.

We need not set forth herein the amounts involved or the mathematical computations which result in the amounts in dispute in the present case. It is sufficient to point out that it is agreed that the widow received $19,386.72 in excess of the marital deduction and there is no dispute that the widow, in any event, will pay federal estate tax on that amount. It also is undisputed that the widow's one-half share was deducted from the gross estate to determine decedent's net or taxable estate. It follows, therefore, that the one-half share to be received by the widow was not taxed and thus the fact that the widow is to receive her one-half part did not cause or contribute to the amount of the federal estate tax on her decedent spouse's estate. The remaining question then is whether the widow, under the circumstances, should be required to pay any part of the federal estate tax assessed against her deceased husband's net or taxable estate.

In resolving that question we should and do take into account the proposition that Congress's purpose in providing the marital deduction was to enable common-law states to place their husband-and-wife residents on an equal basis estate-taxwise with husbands and wives residing in community-property states, and that the only way such equality may be accomplished is for the surviving spouse not to be required to pay any portion of the federal estate tax except on property received by her which contributes to or causes a part of the federal estate tax. In that connection, however, we again point out that Congress left it to the respective states to determine whether each would take full advantage of the enactment of the marital deduction by providing in some manner exoneration to the surviving spouse from the payment of the federal estate tax on property received by the surviving spouse which did not contribute to any part of the federal estate tax; and we note and

consider the fact that the Missouri legislature has not enacted an apportionment statute to accomplish the result made possible by Congress.

We also should and do consider, as was correctly pointed out by the Supreme Judicial Court of Maine in the Old Colony Trust Company case, supra, 163 A.2d 543, that the marital deduction is one accorded the estate and is not by its terms an exemption of or an exoneration to the surviving spouse from liability for the payment of federal estate tax, and the Maine court, even though as we read the opinion it had decided that the language of its intestate statute which determined what the renouncing widow was to receive, compelled the deduction of the federal estate tax before payment to the widow of her share, nevertheless concluded that as "a matter of judicial policy we do not recognize such a compelling equity in the widow arising from the marital deduction as would lead us to a different construction of the statute which defines her interest." 163 A.2d 543.

We also take into account the fact that some, if not all, of the other cases from other jurisdictions to which we have heretofore referred also discussed or suggested, perhaps unnecessarily, equitable considerations involved. For example, the Ohio Supreme Court in Campbell v. Lloyd, supra, stated that the thing that caused the court to reconsider its recent prior decision in Miller v. Hammond, supra, was that if the Miller case was followed in the Campbell case it would result "in the widow receiving as her 'one-half of the net estate', somewhere between $286,000 and $296,000 (or between 37 per cent and 42 per cent) more than all the others entitled to share in the estate." 122 N.E.2d 695, 697. It would appear that the Ohio court was of the view that the failure to require a widow to pay her proportionate share of the federal estate tax despite the fact that the share she took was not taxable as part of the decedent's estate would cause an inequitable result to others who were entitled to share in

the estate. And the North Carolina court in Wachovia Bank & Trust Co. v. Green, supra, was of the view that in any and all events it was for the legislature to determine the effect of the marital deduction in so far as it affected whether the renouncing widow should be exonerated from payment of any federal estate tax by reason of having received a share which was not taxed. And the Wisconsin court in In re Uihlein's Will, supra, while, as noted, construed the words "net estate" in its statute to clearly and unambiguously mean that part of the estate remaining after the payment of all charges including the federal estate tax, nevertheless indicated also that it would not be warranted in any event, to attempt to apportion the impact of the federal estate tax.

We should and do consider also the cases from states which have no apportionment statutes decisive of the question and where no state statute is determinative thereof. In Lincoln Bank & Trust Co. v. Huber, Ky.App., 240 S.W.2d 89, the court held that under a rule of "equitable apportionment" a renouncing widow's share which was not included in the estate for federal estate tax purposes should not bear any portion of the federal tax, because her share would not add to the amount of the tax and thus should not be burdened with any portion of it. The conclusion of the Kentucky court was based in part upon the proposition that the purpose of the enactment of the marital deduction feature in the I.R.C. was to "equalize the estate tax in non-community property states, with that of community property states, and to prepare the way for elimination from the tax burden all those whose legacies or allotments do not create or add to the tax." 240 S.W.2d 91.

In Pitts v. Hamrick, 4 Cir., 228 F.2d 486, a husband died intestate leaving a widow and two children and an estate in excess of one million dollars. A probate court in South Carolina held that the widow was entitled to receive her share of the estate un-

diminished by any portion of the federal estate tax. The internal revenue department ruled that the marital deduction should have been diminished by the amount of the estate tax which the commissioner contended was attributable to the widow's share. In a suit to recover an ensuing deficiency assessment, the United States Court of Appeals affirmed the action of the South Carolina probate court and, among other things, said at page 490: "Where the estate is to receive the benefit of the deduction of the widow's share from the gross estate in order that that share may be relieved of the burden of the estate tax, as Congress intended, it would be unfair and unjust to require her share to bear any portion of that tax; and we find nothing in the law of South Carolina which requires such a result or which would prevent the court from applying equitable principles of apportionment to relieve the share of the widow of this unfair and unjust burden. * * *

"It is inconceivable here that any part of the estate tax should be attributed to the share of the widow, where the purpose of Congress in allowing the marital deduction was to free the interest of the surviving spouse from the burden of that tax and where the estate receives the benefit of the deduction because of that interest." ·

See also In re Burnett's Estate, 50 N.J.Super. 482, 142 A.2d 695, 706 [5].

Inasmuch as there was and is no statute applicable to this case and no judicially pronounced rule of which we are aware, which bars or is inconsistent with the application of equitable principles in determining the question in this case, and inasmuch as the basic principle of equitable apportionment was recognized and applied in Carpenter v. Carpenter, supra, and inasmuch as it seems to us to be inequitable and grossly unjust to require a surviving spouse to pay a portion of the federal estate tax on the deceased spouse's estate solely by reason of the fact that the surviving spouse receives a statutory share of the estate which is not taxed and the receipt of which share does not cause or contribute to cause any part of the tax, we are of the opinion in this case that the renouncing widow's share of her deceased husband's estate should be received by her undiminished by any charge for federal estate tax except by that part of the federal estate tax allocable to that portion of her deceased husband's property received by her which formed part of his taxable estate.

■ Appellants also contend that irrespective of our conclusion as to the widow's liability for federal estate tax, her distributive share should be reduced by the sum of $30,150 by virtue of the terms of a certain contract. At his death, Cooper Hammond owned 1,107 shares of 1,563 outstanding shares in Hammond Sheet Metal Company. The executors sought authority to sell those shares to another company. The residuary heirs opposed the proposed sale. Clara Hammond (the widow) made it known that she desired cash for any interest she might have in the Hammond Sheet Metal Company by virtue of her part of the 1,107 shares. Mr. Wheeler, president of the Hammond Company, desired to retire and Thomas Hammond, decedent's nephew, wanted to take over the management of the company. The remaining Hammond heirs were agreeable to that proposal. Apparently, to give effect to the wishes of the various parties, a contract was signed on March 4, 1955, styled "Master Contract Among Hammond Heirs, Executors of the Estate of C. S. Hammond, Deceased, C. Wheeler and Hammond Sheet Metal Company." The contract recited that deceased's 1,107 shares of the Hammond Company constituted the principal asset of his estate and that Clara Hammond wished to liquidate her interest in the company after her part of the stock was distributed to her; that Mr. Wheeler, the president of the company, wished to sell his Hammond stock and retire; that Thomas Hammond wanted to take over the management of the company and that the other heirs were agreeable

thereto; that, therefore, after obtaining the authority of the probate court, the executors would distribute to Clara Hammond 486 shares of the Hammond stock at $450 per share in partial satisfaction of her distributive share; that upon receipt of those shares she would sell them to the Hammond Company for $450 per share, or $218,700; and that Clara Hammond would sell the four shares which she owned individually to her nephew Thomas for $450 a share. There next appeared among the agreement's provisions paragraph 4 as follows:

"4. The Executors agree to sell to the Hammond Sheet Metal Company 67 shares of the capital stock of Hammond Sheet Metal Company for $450.00 per share or $30,150.00 cash, and Hammond Sheet Metal Company agrees to buy said shares at said price. The proceeds of said shares, when added to the share actually distributed to Mrs. C. S. Hammond, shall constitute her 50% interest in the Hammond Sheet Metal stock, but said sum shall be held by the Executors for the purpose of paying federal estate taxes that might accrue on this estate and for which the estate will be liable. And no other shares of Hammond Sheet Metal Company shall be distributable to Mrs. C. S. Hammond thereafter."

Following were other paragraphs, among them the provisions that Mr. Wheeler was to sell 200 shares of his Hammond stock to the company and 17 shares to Thomas Hammond, for $450 a share, and that Thomas Hammond would deposit $7,740 with the executors as security for his performance of the contract and that such deposit could be used to make certain that Mrs. Clara Hammond and Mr. Wheeler received at least $435 a share for their stock.

It is appellants' contention that by the language of paragraph 4 Mrs. Hammond agreed "to pay from the proceeds of the sale of her shares of Hammond Sheet Metal Company stock $30,150.00 toward the liability of the estate for Federal estate tax." Appellants say that her agreement in that respect was in consideration of the fact that she was to receive cash instead of stock. They say the language is plain and unambiguous and point out that it does not refer to Mrs. Hammond's share of the estate tax, does not mention any refund of the money held, and does not indicate that the money to be "held" was in the nature of a deposit.

Considering the language of paragraph 4 in the light of the stated purposes of the contract and in connection with the other provisions thereof, we cannot agree with appellants' contention. It seems to us that the provision that the $30,150 was to be "held by the Executors for the purpose of paying federal estate taxes that might accrue on this estate and for which the estate will be liable" is ambiguous in the sense that it is patently incomplete, in that it does not provide for the ultimate disposition of the $30,000 furnished by Mrs. Hammond to be "held" by the executors. We are of the opinion, however, that the language reasonably construed is not subject to the interpretation that Mrs. Hammond agreed to pay on behalf of the estate the federal estate tax assessed against it up to $30,150, irrespective of her personal liability therefor, without being reimbursed on final settlement or otherwise.

Appellants' suggestion that Mrs. Hammond did so agree because she was receiving cash instead of stock is untenable. It is true that Mrs. Hammond received 486 shares of stock with the agreement that the Hammond Company would buy those shares for $218,700. And it is also true that the additional 67 shares mentioned in paragraph 4, added to the 486 shares, constituted one half of the total shares in her deceased husband's estate. But Mrs. Hammond was not to receive a price per share for her stock in excess of or any different than the price per share that the other sellers of the stock were to receive, and the arrangement to buy her stock and that of Mr. Wheeler was, in part at least, for the purpose of assuring that Thomas Hammond would be in a position to effectively manage the company. That is to say, Mrs. Ham-

mond did not receive any recognizable advantage by selling the stock to the company for $450 a share which reasonably would cause her to make a gift to the estate of a sum in excess of $30,000 for use by the estate in paying a tax owed by others. Furthermore, prior to the execution of the contract, negotiations were under way to sell the stock for as much as $435 a share to another company. As noted, the contract indicates that it was contemplated that Mrs. Hammond would receive, in any event, no less than $435 a share for her 553 shares, or a total of $240,555. That provision was: "In the event the contract does not go through these proceeds [the deposit by Thomas Hammond] shall be used to indemnify Mrs. C. S. Hammond and C. Wheeler to the extent necessary to bring the total realization on their shares up to a value of $435.00 per share." (Bracketed insert ours.) A sale at $435 per share meant about $22,000 more to Mrs. Hammond than the $218,700 she received under the contract for the 486 shares. It is not reasonable to suppose, in view of the fact that the contract contemplated that in no event would Mrs. Hammond receive less than $240,555 for her half of the 1,107 shares, that she, at the same time and in the same instrument agreed to accept, for no apparent reason, $22,000 less than the minimum contemplated by the parties.

It is agreed that there was not sufficient cash in the estate to pay the federal estate tax obligation due April 27, 1955, which at that time was $73,673.38. In the light of that conceded fact, and taking into account the matters we have heretofore discussed, and recognizing that the language in question provides that the $30,000 cash is to be "held by the Executors for the purpose of paying federal estate taxes" accrued on the estate and that such language does not deal with nor purport to deal with the tax liability of Mrs. Hammond as opposed to the

tax liability of the estate as a whole, and taking into account the fact that if the contract is construed as appellants would have us construe it Mrs. Hammond would have to pay not only her proportionate part of the total federal estate tax but for no discernible reason would have agreed to contribute more than $30,000 toward the payment of a tax for which others were legally liable, we are of the opinion that the parties intended that the executors were to use the $30,000 to apply on the payment of the estate tax which had been assessed against the estate and at some time prior to or on final settlement they would account to Mrs. Hammond for that money so used.

█ Certainly the construction contended for by appellants is not compelled and to so interpret the contract would result in an unreasonable construction in violation of the well-established rule that a "contract of doubtful meaning will be given a construction which will make it fair and reasonable between the parties and will not give one party an unfair advantage of another." Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507 [2, 3].

It is our opinion that Mrs. Hammond did not by virtue of paragraph 4 of the agreement obligate herself to contribute $30,150 to the payment of the federal estate tax and, consequently, the trial court correctly ruled that her distributive share should not be diminished by that amount.

The judgment is affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.