T.C. Memo. 2003-348


UNITED STATES TAX COURT


ESTATE OF MILDRED GREEN, DECEASED, THOMAS R. GREEN,
EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3839-02.                    Filed December 29, 2003.


<u>Jacqueline A. Dimmitt</u>, <u>Jay L. Levitch</u>, and <u>Lewis E.</u>
<u>Striebeck, Jr.</u>, for petitioner.

<u>Steven W. LaBounty</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined a $1,205,541 Federal

estate tax deficiency with respect to the Estate of Mildred Green

(the estate).  The issues for decision are:  (1) The proper

allocation of Federal and Missouri estate taxes to the property

bequests in the will of Mildred Green (decedent); (2) the proper

allocation of Federal generation-skipping transfer (GST) tax to the property bequests in decedent's will; and (3) the fair market value of decedent's shares of stock of Royal Bancshares, Inc.[1]

### FINDINGS OF FACT

The parties stipulated some facts, which we incorporate, along with the associated exhibits, into our findings of fact. Decedent died on September 26, 1997. Her domicile at death was in St. Louis, Missouri. When the petition was filed, the executor's legal residence was in St. Louis, Missouri.

Decedent's Will

On November 10, 1997, decedent's will, dated July 10, 1990, was admitted to probate. Section B of Article FIRST of decedent's will, which deals with the payment of transfer, estate, inheritance, succession, and other death taxes, provides:

> B. I direct my Personal Representative to pay, out of my estate, all transfer, estate, inheritance, succession and other death taxes (exclusive of any generation-skipping transfer tax) payable, including interest and penalties thereon, if any, assessed by the United States or assessed by any state thereof or by any foreign government against my estate or against any gift, bequest or devise, or assessed by reason of the inclusion in my estate for tax purposes of any life insurance proceeds, annuity, joint property, property held as a tenant by the entirety or any other property or interest in property (other than property of any trust created by me under an instrument which provides otherwise with respect to the property of such trust);

---

[1] Respondent represents that, after our resolution of the above-stated issues, the parties will resolve whether the estate is entitled to deductions of $49,433 for executor's commissions and $8,500 for accountant's fees.

> such taxes shall not be charged against nor deducted from any such gift, bequest, devise, life insurance proceeds, annuity, joint property, tenancy by the entirety property or other property or interest in property, upon or by reason of which such taxes are assessed and paid.  Notwithstanding the foregoing, I direct my Personal Representative to pay, out of my estate, any tax imposed under Chapter 13 of the Internal Federal Revenue Code on property transferred in a "direct skip," as defined in Section 2612(c) of the Code; such tax shall not be deducted from or reduce the gift, bequest or devise which constitutes a "direct skip."

Article SECOND of decedent's will provides for the disposition of all her tangible personal property.  Article THIRD gives one-half of the "rest, residue and remainder" of decedent's property to the Lubin-Green Foundation, which is a charity for purposes of section 2055.[2]  Article FOURTH gives the other one-half of the "rest, residue and remainder" of decedent's property in trust for her grandchildren.

At death, decedent was survived by three grandchildren, each of whom was an eligible beneficiary under Article FOURTH of decedent's will.

Decedent's Shares of Common Stock of Royal Bancshares, Inc.

At death, decedent owned 3,276 of the 64,372 shares of issued and outstanding common stock of Royal Bancshares, Inc. (RBI).  Decedent's shares represented 5.09 percent of the outstanding shares of RBI; hers was the fifth largest holding of

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

RBI shares by any one shareholder.  RBI had 62 shareholders at decedent's death.  No one person had a controlling interest in RBI; the largest percentage interest in RBI stock held by any one shareholder was 14.38 percent.  RBI shares have never been listed on any securities exchange.

As of September 30, 1997, RBI had total assets of $172,613,000.  From 1993 to 1997, RBI's total assets and earning assets (interest and dividend-producing assets) increased.  From 1993 to 1997, shareholder equity in RBI increased, and as of September 30, 1997, totaled $17,369,000.  Compared to other banking companies in its peer group,[3] RBI has an above-average capital structure and smaller loan losses.

Between 1993 and 1997, RBI declared the following cash dividends per share:

| Year | Cash Dividend Per Share |
|------|-------------------------|
| 1993 | $1.69 |
| 1994 | 2.01 |
| 1995 | 1.68 |
| 1996 | 2.19 |
| 1997 | 4.06 |

RBI wholly owned a subsidiary, Royal Banks of Missouri (Royal Banks), a Missouri banking corporation.  On the date of decedent's death, Royal Banks operated five branches in the St.

---

[3] Royal Bancshares, Inc. (RBI), is a member of "Peer Group #7" as defined by the Federal Financial Institutions Examination Counsel, along with 972 other commercial banks having total assets of $100 to $300 million and with three or more branch offices in a metropolitan area.

Louis metropolitan area.  For the 12-month period October 1, 1996, through September 30, 1997, Royal Banks had earnings of $1,721,000.

On April 24, 1996, Royal Banks lent $1.6 million to Robert and Bonnie Havrilla (the Havrillas).  Jefferson/Keeler Printing Co. (Jefferson/Keeler) guaranteed this loan.[4]  By a deed of trust dated April 24, 1996, Jefferson/Keeler granted a security interest in certain real property that it owned.[5]  The Havrillas' note was current through a payment made in July 1997; however, no payment was made on the Havrillas' note for August or September 1997, and at decedent's death the Havrillas were in default on their note.

On August 1, 1997, creditors of Jefferson/Keeler filed an involuntary petition in Federal District Court seeking relief under chapter 7 of the United States Bankruptcy Code.  Royal Banks was not a petitioning creditor in this case.  The District Court granted Jefferson/Keeler's motion to convert the involuntary bankruptcy case to a voluntary case under chapter 11

---

[4] The guaranty was unconditional, absolute, and irrevocable. The guaranty did not require Royal Banks of Missouri (Royal Banks), as a condition to performance by Jefferson/Keeler Printing Co. (Jefferson/Keeler), to seek collection from Robert and Bonnie Havrillas (the Havrillas) or to enforce any security interests or liens granted to Royal Banks by the Havrillas.

[5] As of March 1996, the property was appraised at $2.1 million.  Before the security interest was granted, there were no other security interests or liens with respect to the property.

of the United States Bankruptcy Code. On September 12, 1997, counsel for Royal Banks filed a notice of appearance in the voluntary bankruptcy case.

Decedent's Estate Tax Return

On November 9, 1998, the estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, reporting a gross estate of $3,331,853. The estate included decedent's 3,276 shares of RBI stock in the gross estate at an estate tax value of $163,800, or $50 per share. The estate claimed a charitable contribution deduction of $1,565,678 for the bequest to the Lubin-Green Foundation. On Schedule R, Generation-Skipping Transfer Tax, the estate reported the property transferred in trust to decedent's grandchildren as a direct skip with an estate tax value of $1,565,678. In reporting these amounts, the estate allocated and charged all estate (Federal and Missouri) and GST tax to the portion of the estate that passed in trust to decedent's grandchildren.

Notice of Deficiency

On August 30, 1999, respondent commenced an examination of the estate and GST tax return. By notice of deficiency, respondent determined a $1,205,541 deficiency in the estate and GST tax. Respondent determined that at the date of decedent's death the fair market value of the 3,276 shares of RBI stock was $1,048,320, rather than $163,800, as shown on the estate's tax

return.  Respondent also determined that the allowable charitable contribution deduction for the bequest to the Lubin-Green Foundation was $801,723, rather than $1,565,678, as shown on decedent's estate tax return, on the basis of a determination that 50 percent of the estate taxes (Federal and Missouri), including interest and penalties, and all the GST tax should be allocated against the amount passing to the Lubin-Green Foundation.

## OPINION

A.  Allocation of Federal and Missouri Estate Taxes (Apart From GST Tax)

Generally, the manner in which estate taxes are apportioned to the assets included in a decedent's gross estate is determined under State law.  Riggs v. Del Drago, 317 U.S. 95, 98 (1942).  In this case, the parties agree that Missouri law governs the apportionment of the estate's taxes.  Missouri has no apportionment statute.  See Estate of Boder v. Albrecht Art Museum, 850 S.W.2d 76, 78 (Mo. 1993).  The apportionment of taxes is instead determined according to the decedent's intent, looking first to the decedent's testamentary instrument.  Id.  If the decedent's intent is clear, it is to be given effect.  Id. at 79.  If the decedent's intent is unclear, judicial construction of the instrument(s) is appropriate.  Id.  If the decedent's intent cannot be determined, the doctrine of equitable apportionment applies.  Id.; St. Louis Union Trust Co. v. Krueger, 377 S.W.2d

303 (Mo. 1964); Hammond v. Wheeler, 347 S.W.2d 884 (Mo. 1961); Carpenter v. Carpenter, 267 S.W.2d 632 (Mo. 1954). "The doctrine of equitable apportionment places the burden of the federal estate tax on the property that generates the tax and exonerates from the burden the property which does not." Estate of Boder v. Albrecht Art Museum, supra at 78-79 (citing Jones v. Jones, 376 S.W.2d 210, 212 (Mo. 1964)).

In the notice of deficiency, respondent determined that decedent intended 50 percent of her Federal and Missouri estate taxes (exclusive of GST tax) to be paid out of the charitable bequest and the other 50 percent to be paid out of the bequest in trust for her grandchildren. For the first time on brief, respondent has abandoned this position in favor of a new theory: respondent now argues that decedent intended the estate taxes to be paid entirely out of the charitable bequest to the Lubin-Green Foundation. The estate argues that decedent's will contains no clear expression of intent regarding the allocation of estate taxes, and, therefore, the doctrine of equitable apportionment requires an allocation of all estate taxes to the property passing in trust to decedent's grandchildren.

Decedent's will states, in relevant part, that decedent directs her personal representative "to pay, out of my estate, all transfer, estate * * * and other death taxes (exclusive of any generation-skipping transfer tax)". The will goes on to

state that the estate tax "shall not be charged against nor deducted from any such gift, bequest, devise, * * * or other property or interest in property, upon or by reason of which such taxes are assessed and paid".

In the first instance, we might agree that this language represents an attempt on the part of decedent to apportion the estate taxes arising at her death. Arguably, this language might be read to reflect an intent on the part of decedent that the principles of equitable apportionment shall not apply. Nevertheless, the language in decedent's will is not altogether clear as to who ultimately should bear the estate tax burden.

Respondent argues that the "plain, unambiguous" meaning of the language in decedent's will is that estate taxes are to be allocated entirely against the charitable bequest to the Lubin-Green Foundation. If this language has a "plain and unambiguous" meaning, it eludes us, as it evidently eluded respondent inasmuch as he previously interpreted the will language to provide for a 50-50 allocation against the residuary bequests. The language in decedent's will does not purport to express who ultimately should bear the estate tax burden; rather, it provides that certain transfers or property shall <u>not</u> be charged with the estate taxes. This language does not expressly or implicitly charge the estate taxes to the property passing to the Lubin-Green Foundation.

Respondent focuses on the language "upon or by reason of which such taxes are assessed and paid" and contends that this language exonerates from payment of estate taxes all gifts, bequests, and devises other than the residuary bequest to the Lubin-Green Foundation, reasoning that this is the only gift, bequest, or devise that does not constitute property upon or by reason of which such taxes are assessed and paid. Respondent's construction may be tenable but is by no means compelled when the specific language that respondent relies upon is read in context with other language in decedent's will, including the provisions dealing with the residuary bequest to the Lubin-Green Foundation and the residuary bequest in trust to decedent's grandchildren.

For example, if, as respondent contends, the language in question requires the property passing to the Lubin-Green Foundation to bear all the estate taxes, then that is the property "upon which" all the taxes are ultimately assessed and paid, and consequently that property would also be exonerated from the payment of estate taxes. Taken to its logical conclusion, then, this language might be read to exonerate <u>all</u> gifts, bequests, and devises from being charged with the estate taxes (other than GST tax).

Also, in the absence of some clearer expression of decedent's intent, we would be hard pressed to infer an intent on her part to allocate <u>all</u> the estate taxes against the charitable

bequest.  See sec. 2055(c) (limiting charitable contribution deduction to amount of charitable bequest reduced by amount of taxes payable out of that bequest).  This is especially true when we consider the equivalency that the will otherwise gives to the charitable bequest and the bequest in trust to decedent's grandchildren.  These bequests are designated in decedent's will to each constitute one half of the "rest, residue, and remainder" of decedent's property.[6]

We agree with the estate that decedent's will lacks a clear expression of intent as to who is ultimately to bear the burden of the estate taxes.  The will as a whole is ambiguous on this score.  Although decedent's will provision is susceptible to a number of plausible ways of apportioning the estate taxes, none of these interpretations provides a sustainable basis for apportioning the estate taxes between the bequest in trust to decedent's grandchildren and the charitable bequest to the Lubin-Green Foundation.  Under these circumstances, Missouri judicial precedents dictate that we apply the doctrine of equitable

---

[6] This designation might support respondent's original interpretation, which he has now abandoned, that the will requires a 50-50 allocation of the estate taxes between the charitable bequest and the bequest in trust for the grandchildren.  Although this interpretation is plausible, it has no express support in the specific provision of decedent's will dealing with the apportionment of taxes.  Also, the fact that both of the interpretations that respondent has forwarded, as well as other possible interpretations, are similarly plausible supports our ultimate conclusion that the will is ambiguous as to the proper apportionment of the estate taxes.

apportionment.  We hold, therefore, that no portion of the estate taxes (other than GST tax) is allocable to the bequest to the Lubin-Green Foundation.  Cf. <u>Estate of McCutchan v. Commissioner</u>, T.C. Memo. 1979-393.

B.   <u>Allocation of GST Tax</u>

"Unless otherwise directed pursuant to the governing instrument by specific reference to the [GST] tax * * *, the tax imposed * * * on a generation-skipping transfer shall be charged to the property constituting such transfer."  Sec. 2603(b).  The estate argues that decedent's GST tax should be allocated to the property that is to pass in trust for the benefit of decedent's grandchildren because decedent did not direct otherwise in her will.  Respondent argues that all GST tax imposed on the transfer in trust for the benefit of decedent's grandchildren is to be allocated against the charitable bequest to the Lubin-Green Foundation.

Decedent specifically provided for the payment of GST tax on property transferred in a "direct skip".  Decedent's will directs that those taxes "shall not be deducted from or reduce the gift, bequest or devise which constitutes a 'direct skip.'"  The parties agree that the transfer in trust for decedent's grandchildren constitutes a "direct skip" as defined in section 2612(c).  It follows from the express language in decedent's will that the GST tax is not to be deducted from or reduce the

transfer in trust for the grandchildren.

The estate argues that decedent's will fails to instruct the executor not to "charge" the GST tax to the trusts for the grandchildren, as the estate contends the language of section 2603(b) contemplates it must. Contrary to the estate's argument, section 2603(b) does not require any specific language to elect out of the general apportionment scheme of that section, except for a specific reference to the GST tax. It is sufficient that decedent's will made manifest her intent to elect out of the general, statutory apportionment scheme and made a specific reference to the GST tax. Cf. Estate of Monroe v. Commissioner, 104 T.C. 352, 363-365 (1995), revd. and remanded on another ground 124 F.3d 699 (5th Cir. 1997).

The estate contends that the will provision relating to GST tax is "unclear and contradictory". The estate claims that if the GST tax is paid out of the estate and charged to the charitable bequest, "the charitable deduction would go down, the estate taxes would consequently go up and the bequest to the grandchildren would go down by their share of the additional estate tax, which would 'reduce' the bequest to the grandchildren in contravention of the express language of the GST Tax Provision." We are unpersuaded by the estate's argument, which seems to us more "unclear and contradictory" than the will provisions in question. The estate's argument, focusing on the

supposed collateral estate-tax effects of allocating the GST tax to the charitable bequest, ignores the more direct and proximate effect that would result from allocating the GST tax against the grandchildren's bequests. Even if, as the estate suggests, allocating the GST tax against the noncharitable bequests would lower the estate's overall estate-tax burden, we are unpersuaded that such an allocation would not reduce the amounts ultimately received by the grandchildren, since the GST tax would then be borne entirely by their shares, in contravention of the will provision that the GST tax "not * * * reduce the gift, bequest, or devise which constitutes a 'direct skip'".

We hold that the GST tax is not chargeable to the transfer in trust for decedent's grandchildren but rather is to be charged to the charitable bequest to the Lubin-Green Foundation.

C. Valuation of Decedent's 3,276 Shares of RBI Stock

Generally, the value of a decedent's gross estate is determined by including the value of all property, real or personal, tangible or intangible, wherever situated. Sec. 2031(a). The value of every item of property includable in a decedent's gross estate is its fair market value at the time of the decedent's death (or the alternate valuation date). Sec. 20.2031-1(b), Estate Tax Regs. The fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under a

compulsion to buy or to sell and both having reasonable knowledge of relevant facts.  Id.; see United States v. Cartwright, 411 U.S. 546, 551 (1973).

For unlisted stocks, the best indicators of fair market value are actual arm's-length sales in the normal course of business within a reasonable time before or after the date of death.  Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).  Where actual sale prices are unavailable, the stock value is determined by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors.  Id.; sec. 20.2031-2(f), Estate Tax Regs. Valuation of stock is a purely factual determination; there is no one universally applicable formula.  Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

The parties dispute the fair market value of decedent's 3,276 shares of RBI stock.  Respondent, who determined in the notice of deficiency that the fair market value of the shares was $1,048,320 ($320 per share), now contends that the fair market value was $860,000 ($262.52 per share).  The estate, which reported on the estate tax return that the fair market value of the shares was $163,800 ($50 per share), now contends that the fair market value was $655,200 ($200 per share).[7]

---

[7] Generally, the estate bears the burden of proof.  See Rule 142(a).  Effective for court proceedings arising in connection
(continued...)

Each party relies on an expert opinion.  We evaluate expert opinions in light of all the evidence in the record and may accept or reject expert testimony, in whole or in part, according to our own judgment.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Shepherd v. Commissioner, 115 T.C. 376 (2000), affd. 283 F.3d 1258 (11th Cir. 2002).  We may be selective in our use of any part of an expert's opinion.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

1.  The Estate's Expert

The estate's expert, Gary L. Schroeder, is accredited by the American Society of Appraisers as a senior appraiser in the valuation of businesses and intangible assets.  He has been actively engaged in the appraisal and consulting profession since 1981.  Mr. Schroeder determined that, as of September 26, 1997, the fair market value of 100 percent of the shares of RBI stock, on a controlling-interest basis, was $25,900,000.  He determined a $12,900,000 aggregate value for RBI stock after allowing a 17-

---

[7](...continued)
with examinations commencing after July 22, 1998, if certain requirements are met under sec. 7491(a), the burden of proof shall be on the Commissioner as to any factual issue relevant to ascertaining the tax liability of the taxpayer.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.  The examination in the instant case commenced after July 22, 1998.  Nevertheless, neither party addresses whether the requirements of sec. 7491(a) have been met, and, in any event, we do not decide any factual issue on the basis of which party bears the burden of proof.

percent minority interest discount and a 40-percent lack of marketability discount.

2.  Respondent's Expert

Respondent's expert, William C. Herber, is an associate member (candidate) of the American Society of Appraisers and a member of the Institute of Business Appraisers, Inc.  Mr. Herber prepares valuations and market analyses of real estate, business enterprises, and intangible property rights.  He has worked in the valuation field since approximately 1985.  Mr. Herber determined that, as of September 26, 1997, the fair market value of 100 percent of the shares of RBI stock before consideration of any discounts was $26,500,000.  Mr. Herber determined an $860,000 ($262.52 per share) value for decedent's shares of RBI stock.  In determining this value, Mr. Herber allowed a 15-percent minority interest discount and a 25-percent discount for lack of marketability.

The experts agree to a considerable extent on the valuation of RBI stock.  Indeed, the aggregate values the experts determined are relatively close.  The greatest difference in the experts' respective positions relates to the lack of marketability discount.

D.  Pre-Discount Aggregate Value of RBI Stock

1.  Income Approach

Both experts used an income approach to value RBI stock and

arrived at nearly identical values:  Mr. Schroeder determined a value of $23,370,000, and Mr. Herber determined a value of $23,300,000.  Respondent's brief states:  "The experts offered by the parties are in agreement as to the value of the Royal Bancshares derived from the discounted net income method." Considering this concession and out of fairness to the estate, we accept Mr. Herber's $23,300,000 estimate of the value of RBI stock under the income approach.

    2.  Market Approaches

        a.  Guideline Analysis

    Using a market approach, both experts used a guideline analysis of publicly held banks and a transaction analysis of acquisitions of privately held banks.  Using the guideline analysis, the experts arrived at similar values for RBI stock: Mr. Schroeder determined a value of $28,330,000, and Mr. Herber determined a value of $28 million.  Respondent's brief states: "The experts offered by the parties are in agreement on the value of Royal Bancshares suggested by publicly-traded guideline banks."  Considering this concession and out of fairness to the estate, we accept Mr. Herber's $28 million estimate of the value of RBI stock using the guideline analysis.

        b.  Transaction Analysis

    Under the transaction analysis, both experts identified a number of transactions involving the acquisition of privately

held banks which the experts determined were similar to RBI's banking company.

### i. The Estate's Expert

Mr. Schroeder obtained information relating to five banks located in either Illinois or Missouri that were acquired within the 9-month period before September 26, 1997. Mr. Schroeder determined a range of multiples from the price-to-earnings, price-to-equity, and price-to-assets ratios of the acquired banks. Because Royal Banks appeared to be located in a more urban area than the acquired banks and because of "the potential of a significant pending loan impairment on a loan granted to Jefferson Printing", Mr. Schroeder selected multiples between the median and the low end of the range derived from the acquired banks. Mr. Schroeder determined a controlling interest value of $25,920,000 for RBI stock using the transaction analysis.

### ii. Respondent's Expert

Mr. Herber obtained information concerning private banks that were similar to RBI, focusing on privately held commercial banks whose sales were announced and completed between January 1996 and September 26, 1997, and that had assets between $20 and $200 million. He selected nine acquired banks that he determined to be comparable to RBI. He determined average and median price-to-earnings, price-to-equity, and price-to-assets ratios of the acquired banks. He compared these ratios to RBI's ratios and

selected appropriate multiples for RBI stock.  Mr. Herber

determined a value of $28,500,000 for RBI stock using the

transaction analysis.  In reaching his conclusions, Mr. Herber,

unlike Mr. Schroeder, did not consider the effects of any

potential loan impairment.

### iii.  Effect of Potential Loan Impairment

In their disagreement over the experts' transaction

analyses, the parties focus on whether the multiples that the

experts selected should reflect the impairment risk of the loan

to the Havrillas and the pending bankruptcy of Jefferson/Keeler.[8]

Although Mr. Schroeder considered the potential of a loan

impairment in his report, it is unclear whether or to what extent

it depressed his appraisal.[9]  Accordingly, we are unpersuaded

that Mr. Herber's failure to consider the potential loan

impairment materially undermines his valuation recommendations.

---

[8] The difference in the values that the estate's expert, Gary L. Schroeder, and respondent's expert, William C. Herber, determined is not solely attributable to differing treatments of the potential loan impairment.  The experts also relied upon different guideline transactions, which resulted in the use of different price/earnings, price/equity, and price/assets ratios. Respondent, however, raises no issues as to the remaining aspects of Mr. Schroeder's transaction analysis, including his selection of guideline transactions.  Similarly, the estate does not appear to dispute the remaining aspects of Mr. Herber's transaction analysis.

[9] Furthermore, the record reflects that Mr. Schroeder's knowledge and understanding of the circumstances of the loan impairment were, in key respects, faulty.

### iv.  Conclusion

On the basis of all the evidence and using our best judgment, we find that the transaction analysis indicates a value of $27,500,000.

### 3.  Correlation of Values

We have found that the following values were indicated under the income and market approaches that the parties' experts used:

| Approach (Analysis) | Value Derived |
|---|---|
| Income approach | $23,300,000 |
| Market approach | |
|   Guideline analysis | 28,000,000 |
|   Transaction analysis | 27,500,000 |

Like the experts in their respective reports, we find that each of these derived values is entitled to equal weight. Accordingly, we hold that the aggregate value of RBI stock is appropriately estimated at $26,266,667, before taking into account any discounts.

## E.  Discounts

The parties and their experts agree that minority interest and lack of marketability discounts are appropriate in valuing decedent's stock interest in RBI.  They disagree about the amounts of those discounts.

### 1.  Minority Interest Discount

Mr. Schroeder determined a minority interest discount of 17 percent.  Mr. Herber determined a minority interest discount of 15 percent.  Both experts determined the minority interest

discount by calculating the inverse of what they considered to be the appropriate control premium for RBI. Mr. Herber also considered other factors in determining his recommended minority interest discount.

### a. The Estate's Expert

Mr. Schroeder recommended a minority interest discount of 17 percent on the basis of information contained in Mergerstat Review 1998 regarding offers to acquire a majority interest or total ownership of public companies. From this information, with little explanation, he calculated a control premium of 20 percent and an implied minority interest discount of 17 percent. As a basis for this conclusion, Mr. Schroeder states simply that "For Royal Banks of Missouri we have selected a control premium of 20% as being reasonable considering its size, financial performance and geographic location."

### b. Respondent's Expert

Mr. Herber relied on a study of minority interest discounts by Christopher Mercer in Quantifying Marketability Discounts. The Mercer study indicated a median and average minority interest discount of 19 percent. Mr. Herber conducted his own study of control premiums in transactions involving banking companies. He concluded that these transactions indicated median and average minority interest discounts ranging from 18.4 to 19.6 percent, which was "equivalent" to the Mercer study results.

Mr. Herber then considered certain additional factors which led him to reduce the minority interest discount to 15 percent. First, Mr. Herber claims that decedent's 5.09-percent stock interest in RBI is "a substantially larger interest than typical minority interests in publicly traded shares in banks and this would result in a minority interest discount which would tend to be somewhat lower than" the indicated range of 18.4 to 19.6 percent for banking interests. Mr. Herber offers no independent evidence or empirical data to verify these conclusions, and we are unpersuaded that he appropriately relied on this factor in his discount analysis.

Second, alluding to the lack of concentration of ownership in RBI stock, Mr. Herber claims that because decedent held a relatively large minority interest, 5.09 percent, and because no single individual controlled the company (with an interest greater than 50 percent), "the divided interest of the larger shareholders would tend to keep the applicable minority interest discount also at the lower range of the market studies for minority interest discount." We are not convinced that decedent's interest in RBI stock represents a relatively large minority interest or that the holder of that size interest faces less of a challenge in controlling the company. Mr. Herber's suggestion appears purely speculative. In any event, Mr. Herber

determined that this factor indicates a discount at the lower end of the indicated range, not a discount below that range.

Mr. Herber also notes that the banking industry is highly regulated and banking companies are "transparent"; i.e., shareholders have access to a great deal of information regarding banking companies' performance.  He claims that these factors support a lower minority interest discount.  Mr. Herber, however, determined the indicated range of 18.4 to 19.6 percent from his own study of transactions involving banking companies.  Because the indicated range presumably takes into account issues relating to the regulation of banking companies, we are unpersuaded that these factors support a discount for decedent's shares lower than the indicated range.

Mr. Herber also claims that RBI is well capitalized, has high returns on equity and assets, maintains a very high rating in comparison to other banking companies and has offered a "favorable dividend" over the past 5 years.  He claims that these factors reduce risk and enhance the attractiveness of a minority position in RBI relative to other banking companies and support a lower discount than the indicated range of 18.4 to 19.6 percent.  Mr. Herber does not attempt to quantify the effect of these additional factors, and he provides no independent evidence or verification regarding the comparison of RBI and other banking

companies.  Mr. Herber has not persuaded us that these factors support a lower minority interest discount.

c.  Our Analysis

We are unsatisfied that either expert has adequately supported his recommended minority interest discount.   The estate does not argue for a minority interest discount greater than 17 percent.  Mr. Herber, who started with a minority interest discount range of 18.4 to 19.6 percent before making various adjustments that we do not find well supported, has not persuaded us that the minority interest discount should be less than 17 percent.  Accordingly, we hold that a 17-percent minority interest discount is appropriate in valuing decedent's shares of RBI stock.

2.  Lack of Marketability Discount

Mr. Schroeder determined a lack of marketability discount of 40 percent, and Mr. Herber determined a lack of marketability discount of 25 percent.  Both experts used information from

restricted stock studies.[10]  Mr. Schroeder also used information from initial public offering (IPO) studies.[11]

a.   The Estate's Expert

In determining an appropriate lack of marketability discount, Mr. Schroeder relied on restricted stock studies that indicated discounts ranging from 31.2 to 45 percent and an overall average discount of 34.9 percent.  He also relied on IPO studies that indicated an average lack of marketability discount ranging from 43 to 45.7 percent and an overall average discount of 44.4 percent.  After considering certain factors influencing the marketability of RBI shares, Mr. Schroeder concluded that the factors supporting a higher discount would slightly outweigh the factors supporting a lower discount, and he selected a discount of 40 percent.

Mr. Schroeder considered the potential impairment of the loan to the Havrillas and the pending bankruptcy of

---

[10] Restricted stock studies compare private-market prices of unregistered (restricted) shares in public companies with the public-market prices of unrestricted but otherwise identical shares in the same corporations.  See McCord v. Commissioner, 120 T.C. 358, 387-388 (2003).  Historically, restricted shares generally could not be resold in the public market for 2 years.  See 17 C.F.R. sec. 230.144(d)(1) (1996).  In 1997, the required holding period was shortened to 1 year.  See 62 Fed. Reg. 9242 (Feb. 28, 1997).

[11] Initial public offering (IPO) studies compare the private-market price of shares sold before a company goes public with the public-market price obtained in the IPO of the shares or shortly thereafter.  See McCord v. Commissioner, supra at 387.

Jefferson/Keeler as factors indicating a higher discount.  For the reasons discussed above (including Mr. Schroeder's demonstrated incomplete knowledge of the potential loan impairment and the pending bankruptcy), we find Mr. Schroeder's reliance on these factors unpersuasive.[12]

Mr. Schroeder also considered seven prior transactions involving shares of RBI stock as supporting a higher lack of marketability discount.  Six of those transactions, however, occurred between 1990 and 1994--more than 3 years before decedent's death; the remaining transaction occurred in January 1998.  Mr. Schroeder provided no specifics about the prior transactions, and we have no basis for concluding they were at arm's length.  See Rev. Rul. 59-60, sec. 4.02(g), 1959-1 C.B. 237, 241-242.  Furthermore, Mr. Schroeder does not indicate whether or to what extent the information from the prior transactions affected his overall conclusion of an appropriate lack of marketability discount.  Instead, he states equivocally that the existence of prior transactions is "usually a factor that would decrease the lack of marketability discount[;] however, the prior transactions have been at prices which are

---

[12] Moreover, Mr. Schroeder has failed to adequately explain why he considered this factor both in reaching an aggregate value for RBI stock and in calculating a lack of marketability discount.  We are unpersuaded that Mr. Schroeder's double counting of this factor would not lead to understating the value of decedent's shares.

significantly below our appraisal value which is a factor that would increase the lack of marketability discount."

In sum, we believe that Mr. Schroeder's consideration of the potential loan impairment, the pending bankruptcy, and the prior transactions cause his recommended lack of marketability discount to be overstated.  The remaining factors that he identified in his report support a lower lack of marketability discount.

> b.  <u>Respondent's Expert</u>

In determining an appropriate lack of marketability discount, Mr. Herber relied on restricted stock studies indicating median discounts ranging from 24 to 45 percent, with median results from most of the studies trending in a narrow range from 30 to 35 percent.  Mr. Herber placed considerable reliance on a Management Planning, Inc. study, which "indicates that a discount ranged overall from 26.2% to 32.7% with a central tendency of 30.5% overall".  Mr. Herber suggested that RBI's relatively smaller gross income and earnings supported a greater discount, but that "the overriding relative stability of the companies earnings would contribute to a lower applicable lack of marketability discount".  He also indicated that the companies in the studies tended not to pay dividends.  Thus, in Mr. Herber's view, the fact that RBI paid dividends would support a lower discount.  Mr. Herber concluded that these factors together

suggested a lower discount than "the 30% overall average found for all observations in the Management Planning Study."

Mr. Herber also considered certain factors identified in Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. 91 F.3d 124 (3d Cir. 1996), for determining whether an appropriate discount for lack of marketability should be higher than, the same as, or lower than the indicated range of discounts.[13] In considering these factors, Mr. Herber observed that a lack of marketability discount applicable to decedent's stock interest "would have a strong central tendency relative to the overall studies." Taking into account RBI's stability of earnings and its lower overall company risk as a bank, however, he recommended a 25-percent discount for lack of marketability, which he characterizes as being at the "slightly lower end" of the indicated range of median discounts.

---

[13] The factors identified in Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. 91 F.3d 124 (3d Cir. 1996), include: (1) The value of the subject corporation's privately traded securities vis-a-vis its publicly traded securities; (2) the corporation's financial statements; (3) the corporation's dividend-paying capacity, its history of paying dividends, and the amount of its prior dividends; (4) the nature of the corporation, its history, its position in the industry, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) any restriction on the transferability of the corporation's stock; (8) the length of time an investor must hold the subject stock to realize a sufficient profit; (9) the corporation's redemption policy; and (10) the cost of effecting a public offering of the stock to be valued, e.g., legal, accounting, and underwriting fees.

We are unpersuaded by Mr. Herber's conclusions.  In the first instance, his recommended 25-percent marketability discount is very nearly at the rock bottom (rather than at the "slightly lower end") of the 24- to 45-percent range he says is indicated by the restricted stock studies he analyzed.  Furthermore, we question his 24-percent lower range limit.[14]  He himself states that most of the restricted stock studies showed median marketability discounts in a range from 30 to 35 percent.

In his analysis of the Management Planning, Inc. study, Mr. Herber compared RBI with the grouping of companies with gross incomes of $10 to $30 million.  The transactions involving those

---

[14] Mr. Herber cites only two studies that he says indicate median discounts of 24 percent or lower.  One of those studies is the Securities and Exchange Commn. Institutional Investor Study (SEC study).  See Securities and Exchange Commn., Institutional Investor Study Report, H.R. Doc. 92-64 (Vol. 5), 92d Cong., 1st Sess. (1971).  On cross-examination, however, Mr. Herber was unable to respond satisfactorily to the estate's contention that the SEC study describes various categories of sales transactions, and that the category for nonreporting over-the-counter companies, which are most comparable to smaller businesses like RBI, shows a median price discount of 32.6 percent.

Mr. Herber also relied on the "Hall/Polacek study" which, in his opinion, indicated a mean discount of 23 percent.  See Hall & Polacek, "Strategies for Obtaining the Largest Valuation Discounts," Estate Planning (Jan./Feb. 1994).  The Hall/Polacek study also indicates, however, that "Lack of marketability discounts appear to increase as the capitalization of the corporation decreases below $50 million (30%-40%) compared to corporations with capitalizations in excess of $100 million (10%-20%)."  Id. at 43-44.  Because RBI's capitalization was below $50 million, the Hall/Polacek Study would appear to indicate a higher discount (30 to 40 percent) than the mean discount of 23 percent upon which Mr. Herber relied.

companies had an overall average lack of marketability discount of 30.8 percent. Mr. Schroeder points out, however, that this particular group contained only two transactions involving companies with revenues comparable to RBI's relatively small revenues ($12,653,000 for the 12 months preceding decedent's death).[15] According to Mr. Schroeder, those two transactions had an overall average lack of marketability discount of 43 percent. The Management Planning, Inc. study indicates a clear correlation between the size of a company's gross income and the size of the lack of marketability discount. See Pratt, et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 401 (4th ed. 2000) ("There was clear size effect in the Management Planning Study, with smaller companies tending to have larger discounts"). Mr. Herber admits as much on page 75 of his report: "In other words, restricted shares of companies with higher gross income tended to sell for lower discounts than the restricted shares of companies with lower gross income." Because RBI had gross income at the lower end of the range indicated in the Management Planning Study, we might expect the appropriate discount for RBI to be higher than the overall average lack of marketability discount of 30.8 percent indicated for the relevant grouping of companies.

---

[15] Mr. Herber was unfamiliar with the two transactions that Mr. Schroeder identified. He could only testify that "I can look that up. I would like to see that."

In sum, we are unpersuaded that Mr. Herber has adequately supported his recommended 25-percent discount for lack of marketability.

### c. Conclusion

On the basis of all the evidence, and using our best judgment, we hold that a lack of marketability discount of 35 percent is appropriate for decedent's shares of RBI stock. This discount is at the higher end of the narrow range that Mr. Herber identified in his report and is consistent with the average discount that Mr. Schroeder derived from the restricted stock studies.[16]

## 5. Conclusion

We conclude that for September 26, 1997, the fair market value of decedent's shares of RBI stock is $721,297 ($220.18 per share), computed as follows:

| | |
|---|---|
| Total aggregate value of RBI stock | $26,266,667.00 |
| 5.09 percent of value of stock | 1,336,973.00 |
| Less: 17-percent minority interest discount | (227,285.00) |
| | 1,109,688.00 |
| Less: 35-percent discount for lack of marketability | (388,391.00) |
| FMV of decedent's shares | 721,297.00 |
| FMV per share (3,276 shares) | 220.18 |

---

[16] Although we believe that the IPO studies Mr. Schroeder used are entitled to some consideration, we do not find that those studies justify a discount greater than 35 percent.

We have considered all contentions the parties have raised. To the extent not addressed herein, those contentions are without merit or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.